Aaron Johnson
Plaintiff, pro se
646 West 500 North
Telephone: (202) 819-3814
Email: pentasys@msn.com

FILED
U.S. DISTRICT COURT

2018 JUN -8 P 3:42

DISTRICT OF UTAH

BY: _____ DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH, CENTRAL DISTRICT

---

AARON J. JOHNSON

            PLAINTIFF,

VS.

SALT LAKE CITY, a municipal corporation;
Jackie Biskupski, individually and as Mayor;
Margaret Plane, individually and as Legal
Director; Erin Mendenhall, individually and as
5th District City Councilor and Council Chair;
Chris Wharton, individually and as 3rd District
Councilor and Council Co-Chair; Brian Fulmer,
individually and as assistant to Chris Wharton;
Ralph Becker, individually and as former Salt
Lake City Mayor; Stan Penfold, individually
and as former 3rd District Councilor; and DOES
1 THROUGH 10

            DEFENDANTS

|

### CIVIL RIGHTS COMPLAINT FOR INJUNCTIVE, DECLARATORY RELIEF AND DAMAGES

### 42 U.S. Code § 1983

Case: 2:18-cv-00467
Assigned To : Warner, Paul M.
Assign. Date : 6/8/2018
Description: Johnson v. Salt Lake City, et al

---

Contents

1.    INTRODUCTION ...................................................................................................... 3

2.    JURISDICTION AND VENUE ................................................................................. 16

3.    PLAINTIFF ............................................................................................................. 16

RICO NOTICE et. seq. ................................................................................................. 17

4.    DEFENDANTS ...................................................................................................... 17

5.    FACTUAL ALLEGATIONS ..................................................................................... 25

SALT LAKE'S UNWELCOME EXCLUSION ................................................................ 29

EQUALITY? FOR WHOM? .......................................................................................... 39

...SPEAKING ON IMMUNITY ..................................................................................... 64

VI. CAUSES OF ACTION ............................................................................................ 71

COUNT 1: 42 U.S. CODE § 1983 - Violation of The Right to Free Speech Under The First And
Fourteenth Amendments of The U.S. Constitution -  As Applied to All Defendants.................... 71

COUNT 2: 42 U.S. Code § 1983 - Discrimination as A Denial Of Equal Protection ....................... 78

COUNT 3: Section 1983 - Liability in Connection with the Actions of Another - Municipalities
Liability Through Inadequate Training or Supervision.................................................................. 79

COUNT 4: Supervisory Liability Under Monell ............................................................................ 83

COUNT 5: Section 1983 – Liability in Connection with The Actions Of Another – Failure to
Intervene.................................................................................................................................... 90

COUNT 6: Section 1983 – Liability in Connection with The Actions of Another –  Municipalities 91

COUNT 7: Section 1983 –Liability in Connection with The Actions of Another – Choice By
Policymaking Official ................................................................................................................. 94

COUNT 8: Declaratory Judgment and Injunction (28 U.S. Code § 2201, et seq.) ......................... 95

VII. PRAYER FOR RELIEF............................................................................................ 97

1. INTRODUCTION

*"It is emphatically the province and duty of the judicial department to say what the law is,"* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), *and we have held that the President's blocking of the individual plaintiffs is unconstitutional under the First Amendment. Because no government official is above the law"*. – quoting Justice Buchwald, United States District Court, Southern District Of New York, <u>Knight First Amendment Institute v. Trump</u> (1:17-cv-05205), [doc 72] Memorandum & Order, Filed 05/23/18 pp. 74 of 75

1. This suit is initiated *'Because no government official is above the law'*. Salt Lake, as a governmental body, may not exclude the political viewpoints of others from the cities designated public forums. Because this governmental body has engaged in viewpoint censorship and unequal treatment, the deprivations of constitutional rights of the Plaintiff are actionable under 42 U.S. § Code 1983.

2. That the governmental body as Salt Lake, failed to protect, let alone allow, the equal freedoms of speech on designated public forums at the council city, and several of its city councilors social media sites as Facebook.

3. In this case, Salt Lake's ethos on equality appear to be a 'two-steps-short' mission statement about a much hyped 'welcome and inclusion'. No one welcomes an exclusion from an equal participation to engage on a designated public forum acting as a public common for the exchange of political discussion.

4. The messages of equality Salt Lake has broadcast is one of inclusion. Yet, this very public broadcast from Washington Square, then failed to add another unsettling reality about is

3

elected leaders up in a post *Knight v. Trump* social media reality.  That message is how its leadership concealed a history of its own Trump-like restrictions on others. Concealed how it restricted the speech against one of its own residents, a veteran, for the last four years!

5.  Salt Lake concealed this alternative message about the type of "inequality" it provides those who are in consensus with its own viewpoints.  It buried a long record of civil rights deprivations they have been engaging in, like some Emit Till biopic it hoped would never surface.

6.  Salt Lake concealed these violations while it decried the same violations against the sitting U.S. President. How was it possible for this leadership to criticize rights deprivations of thier political foes as they busily obscured their own identical deprivations against its citizens clearly established constitutional rights -- in their own front yard?  Yes, this has been the mixed messaging on Salt Lake's "welcome inclusion" vis-à-vis its leadership and administration.

7.  This governmental body and its policymakers actively continues to acively restrict political engagement on several of its designated public forums. It continues to withhold full participation on these forums to members of a similarly situated' class of people—as Salt Lake residents.

8.  These restrictions—deprived similarity situated resident's rights of speech to residents and— continue on multiple Salt Lake City forums—long before the *Knight First Amendment Institute v. Trump* had even begun.

9.  For a city of welcome inclusion boasting of it concomitant ACLU leadership, an ACLU constantly warning city leaders not to censor others in Utah's establishment media—one

would think the ACLU itself would have taken up this very cause if its mission were equally about assisting others?

10. How are civil rights deprivations not a mixed message of unwelcome exclusion? How is that message not one of bias and discrimination as applied to the Equal Protection Clause of the Fourteenth Amendment?

11. As evidenced by this complaint and summons, Salt Lake's defendants continue to ignore a string of critically acclaimed precedents on First Amendment protections; precedent of law prohibiting the same type of viewpoint-censorship they engaged in for the last four years on multiple designated city public forums.  The most recent precedent of law being Judge Naomi Buchwald's *Knight First Amendment Institute v. Trump* case in the 2nd District of New York. It's featured prominently as the opening statement of this 42 U.S. Code § 1983 cause of action.

12. These precedent, and loads more, are a history of a rule of law Salt Lake ignored.  They are that *'no government official is above the law'*. These rulings are consistent in this form of speech prohibition.

13. So why does Salt Lake continue to act above the law? Why has Salt Lake prohibited speech using the same unconstitutional social media policies of censorship in this case as in the Knight v. Trump case and others, dating to, on or about, October 23rd, 2014?

14. What's known about this case is straight forward. Salt Lake's censorship has been a custom and practiced since 2014, That by its custom, this practice acts as policy. A policy ignoring the voices and viewpoints of those who do not fit a stereotype fantasy of equality in this city.

15. As this case relates to case law under Monell, this governmental body known as Salt Lake City has been (1) committing acts of viewpoint-censorship which are deprivations of a Constitutional right of speech and equal protection; and that (2) these deprivations are committed under action and color of state law - as policies of final policy makers on behalf of this governmental body –see *American Manufacturers Mutual Insurance Co. v. Sullivan*, 526 U.S. 40, 49 (1999) with respect to *Monell*.

16. Despite Plaintiff's efforts to remedy these issues on speech and equality, and there are several, Salt Lake's legal department as the policy makers under Defendant Plane—*defendant Plane being a former ACLU director for the State of Utah*—ignored each and every request seeking remedy or a solution or simply to stop.

17. Plane, and other policy makers as the Mayor, ignored these requests no matter what channel or manner of communications these requests to stop arrived from. The result of all Plaintiff's attempts are now a federal Summons because defendant Plane—*that former ACLU warrior of civil rights as this governmental bodies legal policy maker*-- continued to implement this governmental bodies unconstitutional social media policy in the city council's Communications department and elsewhere.

18. While the communications department committed the action of blocking the Plaintiff on Salt Lake's primary Council Facebook site, *the communications department has never been the final policy maker for Salt Lake's governmental body (emphasis added)*.

19. The communications department's actions are subordinate actions—subordinated as a legal function by custom and practice and as a policy of subordination to Plane. You see, it was the policy makers final authority allowing the blocking to continue without end. The policy

makers in this case, have final authority to evaluate a governmental body's created liability—they allowed the blocking and liability to remain in place dating to 2014 or earlier. That's the message of equality Salt Lake strapped on the back of this plaintiff – Salt Lake's legacy as a welcome home from Iraq and Afghanistan.

20. Plane as the legal policy maker for this governmental body, as applied to *Monell*,[1] acted above the law as a government official. Plane's decisions, as that legal policy maker—are also subordinated to the Mayors decisions as this governing bodies ultimate policy maker.

21. In the language of *Monell*, it translates into the Mayor as a government official equally responsible for the actions of this governing body's subordinates and actions.

### THE HUBRIS OF INDIFFERENCE

22. Despite a century of stare decisis rules and laws, or perhaps longer, Salt Lake's constitutional forms of depriving another's rights of speech have been prohibited with respect to equality and speech in the public square. Despite this century of prohibitions against this unconstitutionality, defendants continued their attack on the First and Fourteenth Amendment rights of others.

23. Speaking directly to the Judiciary's requirements for a plaintiff to cite salient, on point precedents of law, as S. Ct. or 10th Circuit. Ct. rulings when bringing a cause of action—citations speaking *directly to the meat of a claim* where the law is as the Plaintiff plainly states? Plaintiff cites the recent case precedent of *Knight First Amendment Institute v. Trump*

---

1 *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978)

(1:17-cv-05205) whose case properties and characteristics are identical to the prohibited actions of Salt Lake City's defendants.

24. Speaking to the judiciary again, what remains alarming about this case, that it continues to shock the conscience -- are not that the actions of defendant Plane as a policy maker is enforcing the communication department's unconstitutional social media policy.

*It's that Plane and other defendants, upon information and belief, were engaging in their own concealed viewpoint-censorship of the plaintiff while intimately involved and on the periphery of the Knight case at the time the Knight First Amendment Institute case was being litigated.*

 **ACLU Utah**
5 hrs · 

A University of Utah grad and former writer for The Salt Lake Tribune just beat President Donald Trump in court.
... via Salt Lake Tribune



SLTRIB.COM
**Former Utah writer blocked by Trump on Twitter wins Round 1 in court**

25. How is it Salt Lake defendants are both cheering from the periphery of the *Knight v Trump* case while secretly hedging their own bets in their own 'above the law' censorship. Its mixed messaging about a faux equality and unwelcome exclusion by its leadership, its policy makers, its city council and councilors? Welcome to Salt Lake.

26. In terms of plaintiff's exhaustive search for 'administrative relief' at this governmental body and policy makers prior to this suits summons, defendants were repeatedly asked to stop this unequal unwelcome of identical censorship. These requests continued to fall flat, without any response or respite whatsoever.

27. While the State chapter of Utah's ACLU used establishment, media trumpeting a fair warning to Utah's leadership – neither the ACLU or the city—led by a former ACLU director—offered one iota of assistance. It's a message of assistance and welcome I'll never forget.



## ACLU of Utah - Don't Block Constituents on Social Media, ACLU of Utah Warns Federal Delegation

"Because your social media pages are a public forum, your blocking of these individuals is an unconstitutional restriction on their right to free spee...

ACLUUTAH.ORG

28. Defendants were asked to stop committing these invalid actions, blocking him from the city's Facebook site; they'd been asked to stop the application of an unconstitutional social media policy. Finally, I stood in front of the city council at a public city council meeting, stating I was being blocked from having an equal voice.  That request digitally captured on Salt Lake Council's circuit TV—was two months ago. is the hubris of indifference in this case—its administrative response of empty slogans about inclusion from the council as a governmental body of policy makers.

29. In terms of the hubris of these actions? The arrogant quality of these civil rights deprivations as unconstitutional? These unconstitutional social media policies are the identical characteristics in the *Knight First Amendment Institute v. Trump* (1:17-cv-05205) case.

30. While the local Utah Chapter of Utah's ACLU spewed warnings to their political foes via the Salt Lake Tribune and the University of Utah's KUER 90.1 FM, —Salt Lake's governmental body of policy makers continued to block plaintiff and others on designated public forums.

31. The scope of this "blocking" reaches into multiple publicly elected city council districts. It spans at two or more of the city's governmentally controlled, designated public policy, forums. Most ironically-*the blocking occurred on the city's own "Human Rights Commission"*. The irony of that mixed-metaphor of equality is like a Fahrenheit 451 fire sale at its $742/sq ft. main library!

32. Salt Lake City is sued because its social media policy is unconstitutional—because of this hypocrisy—because of a patent, exhibited, custom of ignoring citizens' complaints.  If there is any consensus between the plaintiff and these defendants whatsoever, it's that they

willingly choose deliberately to commit these acts of viewpoint censorship dating to on or about October 23rd 2014.

33. Salt Lake's social media policies as constituted, are illegal. They're discriminatory.  They're harmful to any function of democracy espousing an open, robust, accountable or transparent government.

34. Salt Lake is sued because it's pride and indifference reflect a custom of ignoring a body of errors and omissions being a suspended reality posing as legitimate leadership.

35. Despite the ongoing fair warnings of this pop-cult ACLU —even as the lawsuit is filed today— this governmental body has not stopped enforcing an unconstitutional social media policy. It's latest response was simply, 'good luck'.

36. The indifference to others in violating these types of rights comes with a price tag—one diminishing the value of resident's voices. it represents a dystopian welcome and creates inequality in the city.

37. The price tag of blocking access of resident's engagement on public forums, is the denial to speak like anyone else similarity situated in the city; it's the dampening of one's being. It's the dismissive platitudes about inclusion and equality.  At the heart of it-- that others are not allowed to hear another resident's voices over the drone of a forced political consensus;

38. This act of Blocking is an aggression against civil discourse. It is an anathema to everything the city and ACLU has paraded in Utah about a civil rights partnership protecting the rights of the governed.

39. Salt Lake's fundamental violations go to the core of one's being.  Isn't that the real message here? A message about more legitimate chapters of the ACLU around the U.S. are putting

out?  Why then this reality disconnect in Salt Lake?  Its abject unicorn glittery failures? Its

pop-cult consensus of acceptable casualties about a known failure on Equality?  Yes, equality,

just not for a few residents here.

40. When unconstitutional social media policies are allowed, the personal bias of the policy

makers of a governmental body seep in as a discriminate against non-conforming viewpoints.

41. That bias as the act of blocking another's viewpoints acted as a custom to ignore others—an

openly practiced policy in this 'house of the people'.

*This unequal treatment—this discrimination at the policy maker level – so visibly deprived*

*clearly established rights of equal and fair treatment to residents as similarity situated class*

*in Salt Lake.*

42. This requirement of equality speaks directly to the Equal Protection Clause. It's the part of

the Fourteenth amendment as it applies to the states under the Incorporation Clause of the

same Fourteenth Amendment.

43. More importantly here? It's what a trained attorney, a policy maker for a governmental body

as Salt Lake, should reasonably know on Plane's city salary of $241,790.81[2]!  If Plane didn't

know that, Plane's committed professional malpractice and Salt Lake needs to get a refund

and find a competent policy maker.

44. It's what Plane, as a former policy maker for the Utah chapter of the ACLU did know,

definitively knew and embraced in each ACLU action and lawsuit backed and oversaw when

she represented to represent the rights of Americans—all of them!

---

[2] https://www.sltrib.com/news/politics/2018/05/23/find-out-how-much-the-top-government-employees-in-utahs-largest-50-cities-made-last-year/

45. For a governmental body with such illustrious high-profile policy makers – policy makers associated to the very periphery of a Trump lawsuit via one of the plaintiff's as a former Salt Lake Tribune writer?  This does not bode well indeed.

46. Salt Lake as a governmental body has instead, via these policy makers, continued in a pattern, as a custom, meting out a a four (4) year sentence of exclusion and viewpoint-censorship as unconstitutional because it could!

   *At what point does the judiciary weigh in on the overwhelming magnitude of this governmental body's indifference to another's rights?  That anything less—just as in case 2:18-CV-00029 is to acquiesce to these bad actor's hubris and hypocrisy!*

47. Shouldn't this be mentioned in this complaint to; to shine a light upon a policy maker's $241,790.81 salary who green-lighted and advocated for and approved the deprivation of clearly established rights? Especially in a this governmental bodies non-stop spew about its 'welcome, inclusion, and equality?

[ intentionally blank ]

48. As evidencing herein, plaintiff submits how "blocking" on the primary City Council Facebook

page appears, constituted at https://www.facebook.com/slcCouncil/ , as of 6 June 2018:

49. Note how there's no ability to make comments, or "like" the policy or the comments of

others; or to interact in any manner suggestive of representative or participatory political

approval, dissent or engagement on this designated public forum.   Clearly viewpoint

censorship is alive and well at the Salt Lake City council as chaired by defendant Mendenhall.

50. Also note the council's remarks at the top of it's own post-- boasting "*lots of public comment*",

though it clearly denies comment to the plaintiff -- a material fact established here – as a

similarly situated resident.

**Posts**

 **Salt Lake City Council**
12 hrs · 🌐                                    •••

Recap of tonight's Council Meeting. Budget discussions, hearings and
lots of public comment.

# DA BOARD
# NCIL MEE1

MAILCHI.MP
**RECAP: 6-5-18 SLC RDA Board and Council Meetings**

⤳ Share                                     ▾

14

51. Another post by this governmental body's Council speaks to the bias and prejudice of inequality to a veteran in a protected class.  See the post of 5 June 2018 (below) where those allowed to comment offer praises to defendant Chris Wharton.  Yes, defendant Wharton--a censorship superstar.  Defendant Wharton censoring others as co-chair the city council.



## 2.    JURISDICTION AND VENUE

52. This Court has Federal Question jurisdiction over this action pursuant to 28 U.S. Code §§ 1331;

    28 U.S. Code §§ 2201–2202; 28 U.S. Code § 1361; 28 U.S. Code 2403.

53. Venue is proper in this Court under 28 U.S. Code § 1391(b)(1) and (c)(1)(2). The events giving

    rise to this claim occurred in the District of Utah, and each Defendant acted under color of

    state law; and is sued in their official and individual capacities.

## 3.    PLAINTIFF

54. Plaintiff Aaron Johnson, aka Aaron Jones, is relevant to the Complaint as a resident of Salt

    Lake City, Utah. Plaintiff's Facebook account is registered to Plaintiff under the name of the

    complainant. Plaintiff enjoys the permitted name change to 'Aaron Jones' by a widely

    solicited and knowingly permissible FB policy, in effect, to Facebook's more than 2.2 billion

    registered users.

55. I am a pro-se litigant, where *"[T]he courts are established to administer justice, and you

    cannot have justice if justice is constantly being thwarted and turned aside or delayed by a

    labyrinth of technicality."*[3] This is pointedly what defendants rely—an artifice of form

    overcoming the administration of justice which the courts were established to administer.

    This has been the essence of Salt Lake's legal policy as a custom

---

3 Rules of Civil Procedure for the District Courts: Hearing on H.R. 8892 Before the House Comm. on the Judiciary, 75th Cong., 3d Sess. 2 (1938) (statement of Homer Cummings, Att'y Gen of the United States), quoted in Robert L. Carter, The Federal Rules of Civil Procedure as a Vindicator of Civil Rights, 137 U. PA. L. REV. 2179, 2179 (1989).

56. The Supreme Court has also affirmed, *"a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."*'

### RICO NOTICE et. seq.

Separately, Salt Lake as a government body is and has been committing RICO predicate offenses as § 274 (relating to bringing in and harboring certain aliens), § 277 (relating to aiding or assisting certain aliens to enter the United States). These predicate offenses do not seek litigation within this case.

### 4.      DEFENDANTS

57. **Defendant Jackie Biskupski** is an elected official. She is the Mayor of Salt Lake City. She controls all aspects of the city, including the city council Facebook site as moderated and curated by Salt Lake's city employees on the city payroll.  Salt Lake's city employees are ultimately managed by the Mayor. This includes the SLC communications department employing Dan Wiest and his assistant, Amy.

    a.  The Mayor in her role, oversees the entirety of Salt Lake functions and agencies and city employees. The legal director for Salt Lake, is an appointed position.

    b.  City employees e.g., Salt Lake's legal department director, Salt Lake's public works director, Salt Lake's Chief of Police, etc., are appointed positions. The appointment of these positions is at the discretion and authority of Salt lake's mayor. Appointees as employees serve at the direction and discretion of the Salt Lake mayor as the final policy maker of this governmental body.

c.  Official and individual actions of this governmental bodies employees, concerning the city council communications staff and Facebook page, remain under the final direction and discretion, through city employment, with Salt Lake City and not the counsel.

d.  Thus, the final policy of any decision remains answerable to the Mayor whose ultimate supervisory control usurps that of defendant Plane.

e.  For liability to attach to a supervisor, the subordinate's misconduct must occur at the supervisor's direction or with the supervisor's knowledge and consent.

f.  Biskupski as the top Supervisor knows of and knew—consistently--of the subordinate's misconduct and continued to facilitate, too approve, too condone, and ultimately – failed to act. The mayor had turned a blind eye toward the civil rights depriving policies being supervised by the policy maker of Salt Lake's legal department as it related to the social media policies carried out under Communications Director, Dan Wiest and Amy Farmer.  See - *Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995).

g.  A city employee's decision to "block" others (SLC's communications department past or current employees) on the city council Facebook page—*is ultimately at the decision of an official with final policy-making authority* as the Mayor and those the mayor supervises such as Plane as the legal policy maker for this governmental body.

h.  The discretion to block people using this social media policy as challenged, was the decision of Margaret Plane as this governmental bodies legal department's director and, who's final decision-making authority for those policies is the Mayor.

i.  These under color of state law actions are an extension of the Mayor's position and authority by virtue of her city employees' actions.

18

j.  These actions ultimately controlled by the Mayor herself, are demonstrative of the mayor's scope of authority at all times. And it is the mayor's exercising a finality of oversight and supervisory control over all those she has appointed to administer any department or division and more definitively—authority over each specific employee of the city.

k.  Wiest and his assistant, Amy, are employees of SLC – not employees of the city council. The city council's budget and revenues are derived from the city as the governmental body here. Salt Lake City employment is funded from Salt Lake City's budget as a general expenditure in creating Salt Lake City's payroll.

l.  The City Council public Facebook forum is at all times, administered by city employees on the city payroll; the administration of the city's primary council Facebook pages is by and through SLC's general expenditure toward the administration of the city council Facebook page. Though the communications team of Fowler and Wiest believe they work for the city council—they are paid by the city as the governmental body.

m. Each Salt Lake City public sector employee used in the deployment of SLC policies curating, moderating or administering the city council Facebook page—has limited subordinate government control. Their decisions meet with the supervision of defendant Plane as the final legal policy maker and defendant Mendehall secondarily. As allowable and enforceable under the overarching and supervisory direction and oversight of this governmental body—it is the appointed legal department Director,

Margaret Plane, serving at the discretion of the City Mayor's in the capacity as a policy maker function for this government body;

n. Defendant Biskupski has since the time she took office, been critically aware of Defendant Planes actions to deprive the plaintiff of free speech and defendant Planes actions to cover up a conspiratorial action committed by the Salt Lake City Police under former Chief Burbank and SLCPD general Counsel, Mr. Robinson.

o. That matter is mentioned in litigation, case 2:18-CV-00029 and is sperate and apart from this action.

58. **Defendant Margaret Plane**: Owing to defendant Plane's prior employment and association to the Utah ACLU as its former state director, defendant Plane is perhaps the most prominent plaintiff in this case concerning any conspiracy to deprive the plaintiff of his civil rights. Plane is also central to the cover up a conspiratorial action committed by the Salt Lake City Police under former Chief Burbank and SLCPD general Counsel, Mr. Robinson. That is not at issue here or being litigated inside this case.

a. Defendant Plane, for the purposes of *Monell*[4], is Salt Lake's top legal Advisor/Supervisor and knows of, and knew of consistently, her subordinate's actions as it related to the use of an unconstitutional social media policy.

b. Plane continued to facilitate, too approve, too condone, and failed to intervene an ongoing civil rights deprivation initiated as early as October 23rd, 2014.

c. Planes as a policy maker as related to the social media policies carried out under the council's Communications department, See - Gentry v. Duckworth, 65 F.3d 555 (7th

_____

[4] Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978):

Cir. 1995) had supervisory authority for any action taken which would create a legal liability for this governmental body.

d. Plane's active use of other municipal polices in her office and by her authority—allowed the rights violations to occur and to continue since on or about October 23, 2014. The length of time as a practice and custom, became a policy of deprivation in acquiescence of an unconstitutional social media policy.

e. Plane, acting as the legal director for this governmental body, was formerly the Utah ACLU director. Plane possesses and had possessed at the time of these deprivations of rights described herein—has a sufficient understanding of the violative nature of her actions and omissions in deprivation of clearly established rights of 'Free Speech' enumerated under the First Amendment's Free Exercise Clause and, enforced to the states under the Incorporation Doctrine of the Fourteenth Amendment.

f. As a matter of law to defendants on supervisory liability claims detailing to this judiciary that Plane *"[t]o be liable in this situation, a supervisor must have been involved personally, meaning through personal direction or actual knowledge and acquiescence, in the wrongs alleged"*; Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (applying the framework set by Baker v. Monroe Tp., 50 F.3d 1186 (3d Cir. 1995),

g. This is exactly the case with Plane—she oversees the finality of Salt lake's communication director's decision of blocking others. Plane is personally aware of the blocking and the final action of blocking takes place under supervisory control and

acquiescence of the implementation of Salt lake's invalid, unconstitutional social media policies as applied to the plaintiff.

h. Plane's actions in this cause of action, additionally, as a conspiracy to deprive—and involve at least five other actors and more than one institution.

i. RICO styled deprivation of rights being 'Predicate Offenses" not litigated here.

j. These predicate offenses are outlined in § 1511 (relating to the obstruction of State or local law enforcement), § 1512 (relating to tampering with a witness, victim, or an informant), § 1513 (relating to retaliating against a witness, victim, or an informant). <u>These are the subject matter seeking a writ of mandamus in case 2:18-CV-00029 – not litigated within this case.</u>

k. Plane, in that earlier ACLU capacity, was made aware of an ACLU complaint about SLCPD officers concerning a physical injury sustained by the plaintiff on December 20, 2010. This injury and Plane's knowledge of it while the ACLU director—via the complaint made to her ACLU—carried over as a bias and discrimination into the office of the Salt Lake legal department with [RICO] 8 U.S. Code § 1961 predicate offenses as a political subdivision of the state.

l. <u>This will be described at length in the attached Fed. R. Civ. P. Rule 21 petition seeking a Writ of Mandamus pursuant 28 U.S. Code § 1361 in case 2:18-CV-00029.</u>

59. **Defendant Ralph Becker** was the former Salt Lake City Mayor. Defendant Becker was the mayor at the time the unconstitutional social media policy was used on or about October 23rd, 2018.

60. **Defendant Erin Mendenhall** is a city councilor for District Five (5). Mendenhall is also the acting chair of the city council, overseeing and speaking for the actions and the policies adopted by the city council. Mendenhall presides over the city council meetings and weekly work sessions.

   a. As the District 5 councilwoman, she is a refreshing dose of suspended reality in the accountability aspect of this governmental body. Mendenhall, who had previously blocked others on her own council Facebook page with respect to accountability in office – Mendenhall who chairs the city council – had blocked others with respect to her accountability while in office as it directly related to headline news in Utah's establishment media.

   b. After Mendenhall had outed herself and another city councilor to Utah's establishment Media the Salt Lake City Triune, and alternative media the City Weekly, about a very substantial issue on public accountability while in office. This accountability issue was widely reported in the Salt Lake Tribune and City Weekly. In an article entitled, *"Romantic relationship between Salt Lake City Council members raises concerns"*, [5] portions of that public article were posted to Mendehall social media page used to promote her office and candidacy. It provided excerpts from media she had participated in as widely reported factual information—widely publicized and available still.

   ---

   5 http://archive.sltrib.com/article.php?id=1876741&itype=CMSID (November 28, 2014)

    c.  The excerpt was "*engaged in an affair and traveled together to Minneapolis, Minn.,*

        *in September on city business*"[6]. This led to defendant Mendenhall keeping the city

        council ban in place and banning participation on her own public space.

    d.  Yes, despite a wide array of world media criticizing the U.S. President about this

        Stormy Daniels issue—posting to multiple official sites operated by the government

        across every social media platform--Salt Lake's own Stormy-Mendenhall fandango--to

        which anyone may post about, involved incumbent Mendenhall who was re-elected

        in 2017 over challenger and former Naval officer, George Chapman, by an

        overwhelming margin.

    e.  Mendenhall who exercises wide influence in the role of city council chair, is rumored

        to seek the position of Mayor in 2020.

    f.  All comments made on her site—as in two—resulted in a continued ban, still active

        on the overall city council primary site which Mendenhall chairs, with Wharton as co-

        chair. These statements made on these pubic sites are protected under the first

        amendment as they relate directly to the discussion of politics.

61. **Public Official District 3 councilman, Christopher Wharton:** After Wharton posted to social

    media, about the Parkland Shooting, Wharton, while espousing his own rights of protected

    speech and assembly of his own.

62. Wharton then blocked others from commenting on his posts. Wharton, a 7th generation

    Utahan, and reported local civil rights attorney–is blocking others from participation on his

    publicly designated Facebook pages WHILE the Trump/Twitter lawsuit was litigated.

---

6 Ibid.

63. **Defendant Derek Kitchen**, Public Official District 4 councilman:  Kitchen became a public

    official after prevailing on Utah's landmark marriage equality case, in the 10th District against

    the state of Utah (see Kitchen V. Herbert).

64. **Defendant as former city councilor and RDA chair, Stan Penfold:** Penfolds blocking actions

    occurred prior to leaving office. The exact date is not available until discovery is commenced.

5.    FACTUAL ALLEGATIONS

65. Blocking another's free exercise of speech on designated public forums, where the rules of

    engagement and invitation have been established by the forum, yet not respected, deprive

    another's clearly established rights. That is the precedent of law as the take away from the

    most recent (May 23d 2018) *Knight v. Trump* case.

66.  That the governmental body and its policy makers and its elected officials had done so '*under*

    *color of state law'*, created this cause of action as a civil rights action.

67. That the civil rights act(s) exist to vindicate a violation of one's civil rights by those acting

    under color of law statute that these statutes act as a mechanism, enforceable under that

    mechanism as 42 U.S. Code § 1983.

68. That the governmental body of Salt Lake continues to violate the plaintiff's rights. Doesn't

    that alone speak to the conscious and deliberate action of a governmental body reflective of

    both its administration and its policy makers e.g., defendant Plane, defendant Biskupski? It

    does.

69.  it's reflected as the quality of elected officials character in office.

    a.   city council chair and defendant Mendenhall-5th district,

b.   city councilor defendant Derek Kitchen-4[th] District,

c.   city council co-chair and defendant Wharton-3[rd] District,

d.   former city councilor and RDA chair Stan Penfold-3[rd] District and

e.   former city Mayor, Ralph Becker.

70. Despite the funny, loveable jovial public personalities—the reality of censorship isn't so funny. Defendant's engaged in unconstitutional actions. Their behaviors were invalid. Despite the unconscionable make-up of their practice and custom to block others, it was approved because of a policy by another policy maker as former Mayor Ralph Becker when it originally began.

71. These actions initiated on the city council page—these invalid behaviors beginning under defendant Becker, then continued as a policy, a practice and a custom (Monell) under a new Mayor, defendant Biskupski.  The lynch pin in both former and current mayors as defendants - is defendant Plane.

72. It means that Plane, as the legal director of this governmental body, oversaw the abridgement of what are clearly established rights of speech and equal treatment to a citizen of Salt Lake.

73. That these clearly established rights that were violated during two separate mayor's terms, are the rights enumerated and clearly established in the First Amendment's as the Free Exercise Clause, and the Fourteenth Amendment's Due Process and Equal Protection clauses.

74. That Plane, a former Utah chapter ACLU director as Salt Lake's legal policy maker, understood that these clearly established rights, those speech and equality, are enforceable to the states through the Incorporation clause of the Fourteenth Amendment. That Plane probably knew

about the Incorporation Clause of 1940; that is was a precedent of the S. Ct.[7] often cited in

ACLU casework seeking to vindicate the rights of Americans in each of the 50 states.

75. That because of the structure of 42 U.S. Code § 1983, along with *Monell*, this action arises

out of defendants' known, *and admitted*[8], actions of blocking which created a deprivation of

'*ordered interests in liberty*' cemented in the U.S. Constitution's incorporation of the Bill of

Rights.

76. As this claim relates to Salt Lake's social media policy censoring the free exercise of political

speech, political engagement on a public forum, and political participation – Salt Lake as a

practice had deliberately, for four years, used a social media policy to withhold ALL access to

the city's Facebook pages.

77. That this governmental bodies social media policy -- a policy making/makers practices

speaking to Monell -- had translated into a four-year custom of the same policy restrictions

adopted by other defendants in this case such as Wharton, Penfold, Kitchen and Mendenhall.

78. ***That defendant(s) Plane, Becker and Wharton—who are licensed attorneys--reasonably***

***understood that claims concerning speech and engagement if made to the governmental***

***body as the city--would naturally "arise under" 'color of state law' action as a claim of***

***censorship and equal protection.***

---

[7] *Cantwell v. Connecticut* 310 U.S. 296 (1940)

[8] Communications Director, Dan Wiest, confirmed on June 4th 2018, that Plaintiff as Aaron
Jones had been blocked on or about October 23rd, 2014—yet believed he had been initially
blocked much earlier than that date.

79. That these claims as constituted to this governing body and its policy makers, could only be legitimately made as a constitutional claim as a federal question as to the violation of the plaintiff's rights.

80. That such claims under Fed. R. Civ. P. 8(a) are claims that contour a clearly established right of Speech where the focus is on "*whether the violative nature of particular conduct is clearly established.*" <u>Perea</u>, 817 F.3d at 1204 (quoting *Mullenix v. Luna*, 136 U.S. 305, 308 (2015)).If anyone clearly understood this most of all—it is defendant Plane.

81. defendant Plane engaged in these exact types of "clearly established rights" claims that arise specifically as constitutional claims. Plane would know, emphatically, that as a former policy maker for the ACLU before becoming the policy maker for the governmental body of Salt Lake City – she had as a routine custom and practice as an ACLU policy maker—brought the same quality of constitutional case. That as the current policy maker for Salt Lake—she now defends the city against these exact types of claims as they relate to the language of on point 10th circuit requirements under *Mullenix v. Luna*, 136 U.S. 305, 308 (2015)!

82. Salt Lake's social media was unconstitutional as applied on or about October 23, 2018. It remains unconstitutional today.

83. This social media policy is still consciously used, today, by the city council. After four years of usage, a policy becomes an established practice. As an established **practice** and under the direction and supervision of its legal department's director as the policy maker who kept this blocking in place for four years—the practice became customary to dismiss complaints about its four-year usage. It became a justification to continue the unconstitutional behavior of the governmental body and its elected leadership. Its practices, its customs of bias and

discrimination—had become another policy—alongside the originating unconstitutional social media policy of this governing body.

84. Salt Lake City councilors as a customary practice, have since defendant Penfold, robustly employed this invalid **policy** used to deprive Plaintiff's *"life, liberty, or property, without due process of law"*.

85. **The liberty withheld violated a clearly established right of speech. The violation of speech as revoked, had then ten violated the Equal Protection Clause of the Fourteenth amendment –** *as a direct causality linked to Salt Lake's ongoing support of this illegal social media policy.*

SALT LAKE'S UNWELCOME EXCLUSION

*Salt Lake's unconstitutional social media policy is a deliberate weapon of inequality as applied to Plaintiff, which had begun on or about October 23rd, 2014 on the City Council site.*

86. If at any moment, plaintiff had brought a complaint of equal accommodation to this city, one based on bias—each of these defendants would have immediately escalated such a complaint for resolution.

87. Yet when the nature of the complaint was not of the quality or character of the city's current cause-celeb rights pushed as policy and practice by this government body and its policy makers—defendants became tone deaf and entirely dismissive as those fundamental established rights didn't rise to a level of sufficiency needing equal protection.

BUT-FOR SPEECH RETALIATION AS POLITICAL BIAS

94. Salt Lake's socially oriented media bias, in the Trump era—is a known "Thing". It appears ubiquitously in each of its supporter's social media, ubiquitously in supporting media such as the tribune, appears in the Tribune and other supportive media as it relates to the ACLU— but mostly—appears on the sites of those like these city councilors who used bias and prejudice as a practice here to retaliate against another's viewpoint.

95. When the Florida, Parkland shooting happened—it was the ACLU who organized the #marchforourlives event at the West High. Plaintiff's councilor was there. After that march, held March 24th, 2018, defendant Wharton posted the pictured of the that march.

96. Plaintiff on March 24th 2018, commented on Wharton's site. It wasn't in support for, or in opposition, to Wharton's comments.

97. The comments were just political criticism about the city's ongoing censorship—in. My comments had been deleted and blocked from about March 24th, 2018 forward.

94. Salt Lake's socially oriented media bias, in the Trump era—is a known "Thing".  It appears ubiquitously in each of its supporter's social media, ubiquitously in supporting media such as the tribune, appears in the Tribune and other supportive media as it relates to the ACLU— but mostly—appears on the sites of those like these city councilors who used bias and prejudice as a practice here to retaliate against another's viewpoint.

95. When the Florida, Parkland shooting happened—it was the ACLU who organized the #marchforourlives event at the West High.  Plaintiff's councilor was there.  After that march, held March 24th, 2018, defendant Wharton posted the pictured of the that march.

96. Plaintiff on March 24th 2018, commented on Wharton's site.  It wasn't in support for, or in opposition, to Wharton's comments.

97. The comments were just political criticism about the city's ongoing censorship—in.  My comments had been deleted and blocked from about March 24th, 2018 forward.



*Figure 1https://www.facebook.com/ChrisWhartonSLC/*

Screen shot before comments were deleted and access blocked.

98. Now imagine if instead, I was the Utah Attorney General, Sean D. Reyes.  And I posted a comment about gun ownership, or a picture of me holding an assault styled rifle.  Would Wharton have banned Sean Reyes?  Yet Wharton as my direct councilman for District, had both deleted my comments and blocked me that day. I hadn't talked of guns, let alone ever posted a picture of an assault styled rifle—yet Wharton's indifference to the protected nature of political speech—viewpoint—resulted in censorship on March 24th, 2018.



**Sean D. Reyes**

Profile Pictures · Sep 9, 2017 ·

99. By subjecting speech to review and censorship based on such a vicarious illusion of action as "FB policy", in the most expansive terms, Defendants' Social Media Policy stifled robust debate and disregarded the "***profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open***." Sullivan, 376 U.S. at 270.

100.    Furthermore, the Social Media Policy impermissibly imposes "*special prohibitions on those speakers who express views on disfavored subjects*," namely those whose opinions are believed to be "inappropriate" or "critical of directors or agency policies they called bullying and harassing" where such machinations belie a weakness of public character(s) who "***lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.***" - Winters v. New York, 333 U. S. 507, 333 U. S. 528 (1948).

101.    A law that discriminates based on viewpoint is an "***egregious form of content discrimination***," which is "***presumptively unconstitutional***." Rosenberger, 515 U.S. at 829-30.

102.    To permit the government "***to pick and choose among the views it is willing to have discussed***" in a public forum represents "***censorship in a most odious form, unconstitutional under the First and Fourteenth Amendments***." Police Dep't of Chicago v. Mosley, 408 U.S. 92, 98 (1972)

103.    These acts of censorship are a *not-so-veiled form of exclusion*. They by intent, callously denied equality in Salt Lake as a practice and custom in this case while promoting equality and inclusion for others and—because of the duration as four long years—knowingly excludes others. Salt Lake and its council as constituted, is as a custom, using the tool of political

consensus. It's a practice discriminating against the viewpoints of others. Wharton is a prime example.

104. This form of consensus-discrimination in Salt Lake is affecting far more than this plaintiff. It stifles equality as a broader characteristic of protection; it denies opportunity; it muffles the 'sameness' of engagement and removes access to its leadership, the council and ultimately the resources and support of this city.



105.   When Wharton uses his public space to deride the office of others—calling their administrations, "toxic public policy", or "unprecedented overreach" – how is it Wharton does not self-censor his own speech as he has censored others?



Take 5 minutes to help defend our city from toxic public policy and unprecedented overreach. Call Governor Herbert and tell him to veto SB 234! #vetosb234 #savethenortwestquadrant

801-538-1000



106.   The unconstitutional social media policies used by Wharton in use by this governmental body as constituted, routinely retaliated against another's viewpoint. The custom on their social media sites has been to delete comments and to block them - limiting their speech and participation on the city's designated city public commons—though allowing their own criticism and political viewpoints to dominate.

107.    How does Salt Lake's palpable hypocrisy in this case pretend to celebrate the fundamental rights of one class of residents-- while denying the fundamental rights of others?   It's application of 'equality here is a sham. It is a diminished equity.



**EQUALITY – NOT SO MUCH IN SALT LAKE CITY**

108.    The evidence of this lopsided faux equality is overwhelming—including expenditures from the governmental body's general fund engaging in seeking the equality of others outside the

geographical domain of Salt Lake itself.  Evidently the disconnect of this governmental body has overlooked the issue of equality of sameness right here in the city!

109.    This disconnect is a failure to protect residents already clearly established rights of speech and due process as the form of "equality" left out to those funding and electing these "city officials".

110.    I fully embrace the equality of all citizens; each fundamental right. How did speech and political engagement as fundamental elements of clearly established rights become so forgotten and boring in Salt Lake?

## INVALID, UNCONSTITUTIONAL SOCIAL MEDIA POLICIES

111.    By the practice and customs of how an unconstitutional social media was used to block this plaintiff—these defendants placed themselves above the law to which others are being held.

112.    This policy allowed a customary practice manifesting viewpoint censorship.

113.    The policy usage manifest as a practice of dismissing the prejudice of removing another's voice from the pubic square.

114.    The policy underlies a continued illegal custom and practice as an activity that is prohibited in more than a century of laws concerning free speech activity.  Most recently as touted here, the 2nd District Federal Court's May 23rd, 2018 created precedent citing that no government official is above the law in prohibiting the rights of speech as applied here.

EQUALITY? FOR WHOM?

115.   Inclusion? Equality? Equity? Freedom of speech—that's been a radio static relay-station whose exclusion has been applied as a "social media policy" instead of policy makers sworn duty to the precepts of a U.S. constitution and Bill of Rights.

   ***The 'for whom' is an over-zealous campaign, using city employees and ordinances to discriminate openly, favoring Salt Lake's latest line up of cause-celebs.***

116.   *"The viewpoint-based exclusion of the individual plaintiffs from that designated public forum is proscribed by the First Amendment and cannot be justified by the President's personal First Amendment interests"*[9]

117.   This active suppression of voice, its Truman-Show like reality disconnect, is formulaic of bias and prejudice. It's the policy that created a custom of allowed bias. The custom became the practice of employing an unconstitutional policy. It was practiced over four years in the customary justification to suppress the *'same-ness of a same-set quality of rights'* for this resident in Salt Lake.

118.   As a resident speaking of 'sameness' as equality, the policy discriminated against that 'sameness' of rights which other similarity situated residents in the same class of residents were not denied.

---

[9] Knight First Amendment Institute v. Trump (1:17-cv-05205), [doc 72] Memorandum & Order, Filed 05/23/18  Page 74 of 75.

119.    Speech suppression is a known weapon of retaliation. Discrimination is a retaliation

against those whose political speech does not conform to the *'self-same regurgitation'* of

these defendants pushed political viewpoints.

120.    Their leadership and behavior, as constituted, is inimical to democracy as practiced in Salt

Lake City.



121.    When Plaintiff's free speech had initially arrive on these designated public forums, the

very nature and quality of what is protected political speech as criticism and dissent – resulted

in blocking.

122.    It's defendants use of a social media policies green-lighted' by a governmental body's policy maker which violated clearly protected rights of speech, e.g., the Free Exercise Clause of the First Amendment.

123.    Despite plaintiff's campaign to educate other city members and the Mayor directly on her own social media site -- a clear and present 'Fair Warning" of a civil rights deprivation by the city, those supporting the mayor and council instead respond with a 'like-minded consensus' supporting the city's censorship of others; Defendants excluded— "blocked"—plaintiff as a user after he openly criticized the council, its policies and its leadership. See the mayors Facebook page as it is constituted at: https://www.facebook.com/mayorbiskupski/


124.    The Salt Lake City (SLC) Council operates a number of social media accounts as 'Facebook Pages'. These main internal Facebook pages of the City Council itself, is an important source of news, information, planning, policy and direction concerning SLC government. It is a government owned public forum designated for speech by, to, and about SLC, its council and council members.

125.    The city council and councilors—and other city pages have excluded plaintiff's voice and participation —it is "blocked"— as a Facebook user after openly criticizing the council and its policies.

126.    The interactive space associated with each of the defendant's forums is not government speech and is therefore properly analyzed under the Supreme Court's forum precedents of Cornelius.

127. Ultimately, the delineation of a Facebook thread's interactive space as the putative forum is consistent with the Supreme Court's directive to "*focus[] on the access sought by the speaker*" see *Cornelius*, 473 U.S. at 801.

128. When a user is blocked, the most significant impediment is the ability to directly interact with a post's thread to the blocking user and the entire forum.

129. The public property of the city's Council and Human Rights Facebook forums. The City has opened for use by the public as a place for expressive activity." Perry Educ. Ass'n, 460 U.S. at 45. "To create a forum of this type, the government must intend to make the property 'generally available,' to a class of speakers." Forbes, 523 U.S. at 678 (citations omitted) (quoting Widmar, 454 U.S. at 264).

130. The Defendants Facebook followers who are not blocked –as an act of viewpoint censorship -- enjoy a higher standard of the city's 'inclusions' and 'equality' by the city council and its councilors.

131. This 'viewpoint-inclusion' is a 'sameness of situated persons' in reference to the Fourteenth amendment Equal Protection Clause as it relates to 'same' access and 'same' participation on these Facebook forums.

132. Plaintiff's 'viewpoint-equality' is being denied contra the Equal Protection clause of the fourteenth amendment – as it applies to the Free Exercise Clause of the First Amendment-- as an injury in fact. This injury in fact arises under Federal Question jurisdiction concerning this case's controversy requirements *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

133.    These specific counselors Facebook forums, and other city Facebook forums moderated
        and curated by city employees, i.e., Salt Lake's 'Human Rights Commissions and Office of
        Diversity' are also being blocked.

134.    The blocking removes all participating as 'liking' and 'commenting'. The blocking is by
        action of policy maker oversight and control by direction of SLC's legal Director, Margaret
        Plane; and ultimately this supervisory control resides with Mayor Biskupski.

135.    These forums are also government owned, acting as public forums for the purpose of
        discussing SLC policies and politics.

136.    The Supreme Court recognized social media platforms like Facebook and Twitter provide
        *"perhaps the most powerful mechanisms available to a private citizen to make his or her voice
        heard."* *Packingham v. North Carolina*, slip op. at 8, 582 U.S. _____ (2017). These platforms
        have been "revolution[ary]," not least because they have transformed civic engagement by
        allowing elected officials to communicate instantaneously and directly with their
        constituents.  Elected leaders and city administrations *"in all 50 States and almost every
        Member of Congress have set up [Facebook] accounts for this purpose,"* id. at 5, allowing
        citizens to *"petition their elected representatives and otherwise engage with them in a direct
        manner,"* id. at 8. Facebook enables ordinary citizens to speak directly to public officials and
        to listen to and debate others about public issues, in much the same way they could if they
        were gathered on a sidewalk or in a public park, or at a city council meeting or town hall.

137.    Because of the way the SLC council and councilors and their aides use these forums, the
        account is a public forum under the First Amendment.

43

138.    This case requires us to consider whether a public official may, consistent with the First Amendment, "block" a person from their Facebook account in response to the political views that person has expressed.

139.    Defendants have made the account accessible to all, taking advantage of Facebook's interactive platform to directly engage the city council and councilors followers. The city council and councilors 'posts' routinely generate comments in the vibrant discussion forums associated with each of the posts. Further, Defendants have promoted the SLC city council and councilor(s) account(s) as a key channel for official communication. Defendants use the account to make formal announcements, defend the Mayor and council's official actions, report on city meetings with other city and state leaders, and promote their administration's positions on health care, immigration, foreign affairs, equality, gun issues, and other matters. The SLC city council and councilor(s) posts from these accounts are "official statements," and they have been treated as such by SLC residents, its administration, other politicians, leaders, and its Records Administration for the purposes of state GRAMA requests.

140.    The designation of a forum as 'public' concerns this case as precedent recently, on May 23rd, 2018, established as a controlling precedent. This on point Federal precedent was entered in [doc 72] as a Memorandum and Order of Judge Naomi Buchwald[10] as it concerned the designations of public forums and constitutional law of protected political speech on public forums referenced in the Trump/Twitter lawsuit.

---

[10] United States District Court Southern District Of New York, Case 1:17-cv-05205-NRB

141.    These SLC public forums invite and encourage Salt Lake residents to engage on these forums -- a democratic participation of public speech – a clearly established form of protected speech each of these defendants violated.

142.    Plaintiff was blocked on the city council Facebook page on October 23rd, 2014.

143.    The City Council Facebook page, as constituted, resides at https://www.facebook.com/slcCouncil/.

144.    Protected political speech is a clearly established right to all citizens in the United States as applied to Salt Lake City—they are clearly established rights—commonly known in Salt Lake "equality of voice, equality of access and equality of participation" civil rights campaigns clearly protected for city residents.

145.    Salt Lake has stablished an uber class of protected rights to others by virtue of bias; yet correspondingly has denied the same to plaintiff and others excluded by this Uber-class of protected rights contra an equal class of these same rights protected by the federal government regardless of a governmental body's biases.

146.    Salt Lake City continues to comport itself, unconstitutionally, as an island under the direction of Plane and Biskupski.

147.    The Bill of Rights as applied to the states under the Incorporation Doctrine and, as incorporated "arising under" the U.S. Constitution, give rise to this action to vindicate a set of equal civil rights to this plaintiff binding upon the City of Salt Lake under stare decisis precedents of law numerously cited within this complaint.

148.    These rights denied by Salt Lake's Mayor, its legal department, its city council and councilors—are the rights—regardless of race, sex, creed—or sexual orientation--to engage

in a democratic-styled participation on government-controlled forums using one's freedoms

of speech. These rights denied by Salt Lake City are clearly established rights, pointedly known

to Salt Lake's city's legal director and Mayor.

149.   This City's practices are patently unconstitutional and should shock one's conscience in

view of the platitudes of this city's administration. This suit seeks to end what are offensive

in nature, shocking to the conscience as retaliation. They are an unwelcome discrimination in

the United States.

150.   Defendants acted out an in-accountability to both equity and justice; robustly defending

under its social media polices a complete indifference to SCOTUS precedents as 'on point'

case precedents acting as law concerning what are clearly-established rights; rights

guaranteed and protected and enforceable as the First Amendment via the incorporation

Doctrine.

151.   Defendants violations continue to contour the same bravado foundational of this case

and, despite receiving 'fair warning' as a UCA 63g-7-401 recorded in the Salt Lake City

recorder's office—and dozens of attempts to resolve these issues without litigation—Salt lake

City has dodged each dutifully provided civil notice of intent as a 'fair warning' to cease these,

and other known, violations these same defendants are indifferent to with the hubris of a "*so

sue us*" mentality at tax payer expense.

152.   In summation of this introduction section, Defendant's invitation to participate on these

Facebook forums, effective via invitation, solicitation, had knowingly designated these

forums as "designated public forums" e.g., the ***Packingham/Reno*** public commons today as

"*the most important places ... for the exchange of views... is cyberspace ... and social media in*

particular." *Packingham v. North Carolina*, 137 S. Ct. at 1735 (internal citation omitted); See also *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997) (acknowledging the "***vast democratic forums of the Internet***").

153.    Defendants actions of censorship cannot be buttressed by a defense, in their own coming Rule 8 affirmative admissions construed under a prolixity of either "Facebook policy" or "Salt Lake social media policy" which the Facebook Corporation did not undertake.

154.    Censorship here, as a clearly stated short and simple statement of violation of a clearly established right is supported by Justice Black in *Mills v. State of Alabama*, 384 U.S. 214 (1966),

> "*Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs*."

155.    Plaintiff respectfully asks this judiciary to declare Salt Lake City's social media policies and practices are a viewpoint-based exclusion of the Plaintiff's right of speech; that this violation of the First and Fourteenth amendments is unconstitutional; that viewpoint censorship as constituted on these forums, had arrived as a form of bias and discrimination in violation of 28 U.S.C. § 1981, and order the Defendants to provide restitution for these violations of clearly established rights and to restore access immediately.

156.    Under *Monell v. Department of Social Serv.*, 436 U.S. 658 (1978), a municipal government can be held liable under Section 1983 if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a "*policy*" of the local government's legislative body or of

those local officials whose acts may fairly be said to be those of the municipality. That policy is Salt Lake's social media policy used to block the Plaintiff.

157.    The federal question to this judiciary, on Salt Lake City's censorship, is concise as it relates to an invalid social media policy creating a viewpoint-censorship cause of action:

*Why is Salt Lake City's privilege and bias allowable—special-- above the law – especially its evidenced hypocrisy depriving the civil rights of some while nonstop parading a much-heralded theme of welcome and inclusion? Its social media policy suggests otherwise.*

158.    This hubris against pro-se litigants manifest here, continues to deny every accountability to a rule of equity and law and the US constitution--specifically to its citizens—and discounts law and equity under an attack in this court against pro-se litigants, "seeking remedies for harmful discriminatory conduct, too vindicate civil rights enumerated by congress in obtaining protection against prospective harm of this kind."

159.    The Salt Lake City Council as an 'entity' representing this city, its associated City Councilors own personal First Amendment interests, DO NOT supersede those of the plaintiff or Constitutional law as a matter of Federal Question jurisdiction.

160.    Censorship is an unamerican reminder of dystopian regimes and personalities. These defendants—with little exception -- are busily glad-handing citizens in the public eye about the city's 'inclusion' and 'equality' while defendants denied "*speech protected by the First Amendment*"[11] on these public forums.

---

[11] Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985);

161.   Defendant's peculiarity as both violation and the defense of this violation, squarely resembles *"another reason Congress conferred original federal-question jurisdiction on the district courts was its belief that state courts are hostile to assertions of federal rights*." - see *Mitchum v. Foster*, 407 U.S. 225, 238, 242 (1972).

162.   Plaintiff's District standing remains *"any citizen of the United States*." It allows a cause of action created under an Article III case or controversy as, *"any citizen of the United States*".

163.   Plaintiff's injury is ongoing as *"a deprivation of any rights, privileges, or immunities secured by the Constitution and laws*."

164.   Plaintiff's claims are made as short and simple statements as a claim against Salt Lake City's open practice of embracing viewpoint-censorship under the authority and direction of Mayor Biskupski and legal director Margaret Plane—a bias whose authority to block others and targeting alternate political viewpoints arose from the decisions and actions of city employees under the direction of Plane and Biskupski.

165.   The fallout of their failed direction is the sacrifice of clearly established rights any reasonable person would know—pointedly defendant Plane as a former ACLU director as someone who intimately –alleged herein – was in some degree of proximate knowledge or contact with, and association to, at least one of the plaintiff's in the recent *Knight First Amendment Institute v. Trump* case (1:17-cv-05205).

166.   Salt lake's council, as a body of elected officials, is actively suppressing the voices of this residents. The finality of its decisions are not the councils as they claim—as the council does not write the checks or have resources of its own to pay city personnel. The finality rests with defendants Plane and Biskupski.

167.   The [governing body] of the Salt Lake City is a policymaking entity whose actions represent a decision by the government itself. The same is true of an official or body to whom the [governing body] has given final policymaking authority: The actions of that official or body represent decision(s) by the government itself. Thus, when [governing body] or [policymaking official] makes a deliberate choice to follow a course of action taken by ground level employees of the communications department to block others under a social media policy the governing body is responsible for, that choice represents an official policy. Through such a policy, the [governing body] or the [policymaking official] may cause a violation of a federal right by: directing that the violation occur, authorizing the violation, agreeing to a subordinate's decision to engage in the violation as occurred in this case.

168.   [The [governing body] or [policymaking official as Plane and/or Biskupski] may also cause a violation through [inadequate training] [inadequate supervision] [inadequate screening during the hiring process], [failure to adopt a needed policy], but only if the [municipality] is deliberately indifferent to the fact that a violation of [the right not to be blocked on a public forum causing a deprivation of a constitutional right such as equal protection or speech] is a highly predictable consequence of the [inadequate training] [inadequate supervision] [inadequate screening during the hiring process] or [failure to adopt a needed policy].

169.   This "interactive space" where Facebook users may directly engage with the content of the Salt Lake City Council and City Councilors -- are properly analyzed under the "public forum" doctrines set forth by the Supreme Court, that such space is a designated public forum, and that the blocking of the plaintiff's speech to engage "*is speech protected by the First Amendment*" at *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797

(1985); see also *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* (ISKCON), 505 U.S. 672, 677 (1992).

170.    The deliberate choices by an individual government official, e.g., Plane and Biskupski, constitutes government policy if the official has been granted final decision-making authority concerning the relevant area or issue. Plane was granted final legal authority to approve the actions of city employees concerning their interpretation of the social media policies of the city—and the actions of its city councilors without any specific training for their own sites representing the city governing body.

171.    Biskupski gave the final authority for Plane to act as the final legal authority. Meaning, the Mayor of Salt Lake granted final legal authority to approve the actions of city employees concerning their interpretation of the social media policies of the city—and the actions of its city councilors without any specific training for their own sites representing the city governing body.

QUALIFICATION OF PUBLIC FORUMS--DESIGNATION

172.    The Plaintiff sought to engage and participate in political activity—yet was denied these clearly established rights to engage in political *"speech on matters of public concern"* that *"fall within the core of First Amendment protection," Engquist v. Ore. Dep't of Agric.*, 553 U.S. 591, 600 (2008).

173.    First, to potentially qualify as a forum, the space in question must be owned or controlled by the government.  The city council sit is owned by the government.

174.    In the case of the city council individual counselor sites, they are administered and operated under the use of an elected officials title.  The Supreme Court has frequently

51

referred to "government-owned property," e.g., *Pleasant Grove City*, 555 U.S. at 478; see also

ISKCON, 505 U.S. at 678 (referring to property that the government "owns and controls"), its

precedents have also made clear that a space may be a forum based on government control

even absent legal ownership, see, e.g., *Christian Legal Soc'y Chapter of the Univ. of Cal. v.*

*Martinez*, 561 U.S. 661, 679 (2010).

175.   When this Court employs forum analysis to determine when a governmental entity, in

regulating property in its charge, may place limitations on speech - *"[A] speaker must seek*

*access to public property or to private property dedicated to public use to evoke First*

*Amendment concerns."* Cornelius, 473 U.S. at 801

> *"This requirement of governmental control, rather than complete governmental*
>
> *ownership, is not only consistent with forum analysis's focus on "the extent to which the*
>
> *Government can control access" to the space and whether that control comports with the*
>
> *First Amendment, Cornelius, 473 U.S. at 800, but also better reflects that a space can be*
>
> *"a forum more in a metaphysical than in a spatial or geographic sense," Rosenberger v.*
>
> *Rector & Visitors of the Univ. of Va., 515 U.S. 819, 830 (1995), and may "lack[] a physical*
>
> *situs," Cornelius, 473 U.S. at 801, in which case traditional conceptions of "ownership"*
>
> *may fit less well."* [12]

176.   When the judiciary analyzes the specific actions of viewpoint censorship in question, and

its additional 'but-for' speech retaliation as type of discrimination also in question –

defendants actions of blocking and the discrimination by its city councilors -- are *"under color*

---

[12] Knight First Amendment Institute v. Trump (1:17-cv-05205) 2nd fed. Dist. Ct., Document 72
memorandum & Order, Filed 05/23/18   Page 42 of 75

*of state law*" precedents developed in the context of actions against state officials under 42 U.S.C. § 1983.

177.     In that context, the standards for whether an action was taken "*under color of state law*" and whether an action constitutes "state action" are identical, see *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982), and an official takes action under color of state law when he "*exercise[s] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'*" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

178.     While the Constitution applies only to the government and not private individuals, the requirement of state action in the forum context is not usually analyzed separately from the government control or ownership requirement.

179.     While defendants Mendenhall, Wharton and Kitchen may contend they blocked plaintiff on a Facebook forum, previously private as established before they became publicly elected officials, each of these defendants in becoming elected officials then began to conduct official city business, in some cases (Mendenhall, Kitchen, Wharton), using their respective forums in the promotion of their publicly elected characters, policies and council functions. Further, as illuminated in the *Knight First Amendment Institute v. Trump* viewpoint censorship case referenced as "blocking" the comments of others;

> "*For the same reason, defendants' reliance on the President's establishment of the account in 2009, Stip. ¶ 32 -- well before his election and inauguration as President -- is unpersuasive. To the extent forum analysis applies, "[t]he past history of characterization of a forum may well be relevant; but that does not mean a present characterization about*

*a forum may be disregarded." Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 77 (1st Cir. 2004); see Make the Rd. by Walking, Inc. v. Turner, 378 F.3d 133, 143 (2d Cir. 2004) (recognizing that certain First Amendment restrictions apply "so long as a forum remains public"); cf. Bronx Household of Faith v. Bd. of Educ., 650 F.3d 30, 41 (2d Cir. 2011) (reasoning that "the nature of the site changes" depending on how the site is being used). The Supreme Court has expressly held that "a state is not required to indefinitely retain the open character of the facility," e.g., Perry Educ. Ass'n, 460 U.S. at 46, but changes need not be one-directional"* [13]

180.    Indeed, 'on point' citations required in this analysis underlies the entire concept of a designated public forum resting on the premise that the nature of a (previously closed) space has been changed.  See, e.g., *Cornelius v. Naacp Legal Defense and Educational Fund, Inc.* 473 U.S. 788 (1985).  Defendant's Wharton, Kitchen and Mildenhall's previously closed forums had been, consistent with election to public office—changed.

181.    In *Knight First Amendment Institute v. Trump (2017)*  Judge Buchwald compares two examples pertinent here...,

   *"if a facility initially developed by the government as a military base -- plainly not a public forum under Greer, 424 U.S. at 838 -- is subsequently decommissioned and repurposed into a public park the present use of the facility as a park would bear much more heavily on the forum analysis than its historical origins as a military installation.  Similarly, if a privately constructed airport were subsequently taken over by a public agency, forum*

---

[13] Knight First Amendment Institute v. Trump (1:17-cv-05205) 2nd fed. Dist. Ct., Document 72 memorandum & Order, Filed 05/23/18  Page 48 of 75

*analysis would focus on its current use as a public airport rather than its prior use as a*
*private one. Cf. ISKCON, 505 U.S. at 681 ("The practices of privately held transportation*
*centers do not bear on the government's regulatory authority over a publicly owned*
*airport.")")*[14]

182.    These public commons as designated public forums operate as a collective participatory
        service in the democratic function of Salt Lake City. These forums allow those outside the city
        to freely participate—forums espousing the principles of "equality" and "inclusion".

183.    Salt Lake has a policy, of routinely, allowing comments from non-city-residents. This is
        evidenced in the numerous dialogues of the Mayor's Facebook postings concerning topics far
        beyond the city itself.

184.    This public forum routinely provides Salt Lake residents, city news, city updates, and city-
        wide information targeting each of Salt Lake's seven (7) city districts and District councilors,
        concerning the operations, policies, and proposed directions of the city.

185.    The role of these designated public forum operates are an important commonality to the
        residents of SLC. It acts as a source of news and information about the SLC government. It
        acts as a public forum for speech by, to, and about the operations of SLC government as it is
        incorporated under charter by the State of Utah.

186.    This case in controversy arises under Law and Equity of the U.S. Constitution Article III
        Section 2 and § 1331. It concerns today—as a century ago—the ongoing S. Ct. protection of

---

[14] Ibid, Page 49 of 75

one's right of political speech. It continues to be salient, topical, as constitutional questions under which this claim has arisen.

187.    These questions are squarely rooted in a doctrine of equity—a rule of equanimity of one's unique voice to robustly discuss politics. This federal question is about the equality of same access and same participation of one's voice and viewpoints--regardless of one's creed, skin color, political expressions or in this case—Salt Lake's cause-celeb of acting to limit others voice and access.

188.    This case seeks a Federal answer on these Significant Federal Elements on the mechanism which these defendants, under color of state law deprived clearly established constitutional rights under (1) 42 U.S. Code § 1981 as discrimination against 'Equal Rights'; (2) § 1983 as available relief to vindicate a 'deprivation committed under color of state law' concerning a 'clearly established right' and (3) § 1985(3) as 'conspiracy to interfere with civil rights'.

189.    These defendants concerning these elements, all, committed statutory violations against Plaintiff's equity being constitutionally guaranteed to this Plaintiff, and the public at large-- a protected right enumerated by the Bill of Rights as incorporated in the body of the U.S. Constitution.

190.    Indeed, this case is a Federal Question of one's constitutionally protected free speech; of equal access to same rights; and of redress enforceable to the states under the Incorporation Doctrine of the 14th amendment in violation of one's rights.

191.    These Federal Elements invoke the statutory vehicles of the Civil Rights Reconstruction Act(s)– asking this Judiciary's determination why SLC defendants—and State Senator Jim

Dubakis-- continue to violate the same laws of the land which a standing U.S. president cannot grant himself?

> ***Especially in the case of defendants Wharton and Dubakis who take exception to this presidency on their public forums and posts while visibly denying their own constituents the right to respond and to be heard by others on the same forums—as a violation of free speech and equal protection!***

192.    What special nature is this Salt Lake City and these defendants, that they knowingly, by conspiracy, grant themselves a form and level of special exception in their own visible violation of others rights—placing their own first amendment interests above other citizens first amendment interest. That they act as lone judge and arbiter of the U.S. Constitution beyond even the ruling in the US Federal District Court of New York—and above the same laws as the sitting U.S. President!

193.    Why are these defendants, these low-level officials and legal municipal officers and city councilors—breaking and disobeying the same laws and rules of equity in robbing the clearly established rights of others? That they continued to justify an indifference to their prohibited actions against any citizen in any District with the same equality of standing as the United States President as it concerns viewpoint censorship on a designated public forum?

194.    That it is Kitchen, Wharton and Dubakis (not named here) suggests as social media bias and social media collusion to do so.

195.    These Federal elements raise the specter of, upon information and belief, a conspiracy arising under 42 U.S. Code § 1985(3) to deny rights and liberties to others. That it is by and through this SLC Mayor, its legal director and a number of the members of its city council who

intimately knew of the case against the U.S. President as they continued to visibly deny the same level of protections to the plaintiff which they each have continually decried against the U.S. President?

*The overwhelming magnitude of these defendant's indifference to their own hypocrisy, should compel this judiciary to immediately grant injunctive relief in this case to rebalance the distorted fantasy of either inclusion or equality in Salt Lake City!*

196.    Each of whom having a personal working knowledge of a nearly identical landmark case, in the 2nd Federal Ckt, Ct, District of New York, concerning the personal Social Media Twitter account of the United States President, Donald Trump, as constituted @realDonaldTrump.

197.    That these 42 U.S. Code § 1985(3) elements as a conspiracy, had been conducted to intentionally thwart politically protected speech such as dissent and criticism; were done to restrict access and redress; have knowingly restricted the same types of civic participation to the public on these designated public forums in violation of clearly established rights under the First amendment enforceable to the states under the Incorporation Doctrine of the Fourteenth amendment.

198.    As of the date of this filing, the city of Salt Lake is aware of several S. Ct. cases addressing Free Speech protections as applied to social media platforms like Facebook and Twitter.

199.    Additionally and pointedly known by these defendants, each one, is a nearly identical landmark case involving the personal Social Media Twitter account of the United States President, Donald Trump, as constituted @realDonaldTrump.

200.    That recent (may 23rd 2018) landmark case, held that,

> "…portions of the @realDonaldTrump account -- the 'interactive space' where Twitter
> users may directly engage with the content of the President's tweets -- are properly
> analyzed under the 'public forum' doctrines set forth by the Supreme Court, that such
> space is a designated public forum, and that the blocking of the plaintiffs based on their
> political speech constitutes viewpoint discrimination that violates the First Amendment"…,
> That "No government official — including the President — is above the law"[15].

201.    Government speech is one category of speech that falls outside the domain of forum
analysis: when the government "is speaking on its own behalf, the First Amendment strictures
that attend the various types of government-established forums do not apply."  Walker v.
Tex. Div., Sons of Confederate Veterans, Inc., 135 S. Ct. 2239, 2250 (2015).  "The Free Speech
Clause restricts [only] government regulation of private speech; it does not regulate
government speech."  Pleasant Grove City, 555 U.S. at 467.

202.    However, "[t]here may be situations in which it is difficult to tell whether a government
entity is speaking on its own behalf or is providing a forum for private speech."  Id. at 470.
Private involvement in the formulation of the speech in question does not preclude the
conclusion that it is government speech.  For example, Pleasant Grove City concluded that
monuments that were privately financed but subsequently accepted by a municipal
government and displayed on public park land was government speech, see id. at 470-71, and
Walker held that specialty license plate designs proposed by private groups but approved and

---

[15] 2nd U.S. District Court for the Southern District of New York, Case 1:17-cv-05205-NRB.
Document 72 Memorandum and Order Filed 05/23/18

issued by a state department of motor vehicles was also government speech, see 135 S. Ct. at 2248-50.

203.    In the captioned case of Johnson v. City of Salt Lake, *"speech that is otherwise private does not become speech of the government merely because the government provides a forum for the speech or in some way allows or facilitates it."* Wandering Dago, Inc. v. Destito, 879 F.3d 20, 34 (2d Cir. 2018) (citing *Cornelius*, 473 U.S. at 811-13).

204.    Again, citing <u>*Knight First Amendment Institute v. Trump*</u> (1:17-cv-05205) [doc 72] memorandum & Order, Filed 05/23/18   Page 54 of 75

> *In assessing whether speech constitutes government speech as opposed to private speech, the Supreme Court has considered at least three factors: whether government has historically used the speech in question "to convey state messages," whether that speech is "often closely identified in the public mind" with the government, and the extent to which government "maintain[s] direct control over the messages conveyed," with Walker's application of these factors "likely mark[ing] the outer bounds of the government speech doctrine." Matal v. Tam, 137 S. Ct. 1744, 1760 (2017) (quoting Walker, 135 S. Ct. at 2246-49); see also Wandering Dago, 879 F.3d at 34 (distilling the same three factors from Walker).*

205.    "[T]he extent *to which the Government can control access depends on the nature of the relevant forum*," *Cornelius*, 473 U.S. at 800.  The judiciary must consider whether the blocking of the individual plaintiffs is permissible in a designated public forum.  *"Regulation of [a designated public forum] is subject to the same limitations as that governing a traditional*

*public forum"* -- restriction are permissible *"only if they are narrowly drawn to achieve a compelling state interest."* ISKCON, 505 U.S. at 678 79; see also *Cornelius*, 473 U.S. at 800.

206.    Regardless of the specific nature of the forum, *"[v]iewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations."* *Rosenberger*, 515 U.S. at 830; see also *Matal*, 137 S. Ct. at 1763 *("When government creates such a forum, in either a literal or 'metaphysical' sense, some content- and speaker-based restrictions may be allowed.  However, even in such cases, what we have termed 'viewpoint discrimination' is forbidden."* (citations omitted) (quoting Rosenberger, 515 U.S. at 830-31)).

207.    Here, the plaintiff is indisputably blocked as a result of viewpoint discrimination.  The complaint establishes that "[s]hortly after the Plaintiffs posted comments to each of the defendants Facebook sites (Wharton, Kitchen, Mendenhall) . . . in which he criticized the council's leadership or its policies, the councilors blocked Individual Plaintiff. The continued exclusion of the individual plaintiffs based on viewpoint is, therefore, impermissible under the First Amendment[16].

*"The elimination of the blocked user's ability to reply and comment is more than the blocking of a user merely ignoring the blocked user; it is the blocking user limiting the*

---

16 Even if the interactive space associated with the content of a post or thread constituted a nonpublic forum, the exclusion of the individual plaintiffs would not withstand First Amendment scrutiny.  "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  Cornelius, 473 U.S. at 806.  The blocking of the plaintiff, which resulted from their "comments that criticized the council and its policies is not viewpoint-neutral, and is therefore impermissible "regardless of how the property is categorized under forum doctrine," Wandering Dago, 879 F.3d at 39.

*blocked user's right to speak in a discrete, measurable way*".[17] "*The audience for a reply extends more broadly than the sender of the tweet being replied to, and blocking restricts the ability of a blocked user to speak to that audience.  While the right to speak and the right to be heard may be functionally identical if the speech is directed at only one listener, they are not when there is more than one*".[18]

208.    That the blocking of the individual plaintiff as a result of the political views expressed is impermissible under the First Amendment.  While it must recognize, and are sensitive to, these city councilors personal First Amendment rights, they cannot exercise those rights in a way that infringes the corresponding First Amendment rights of those who have criticized them.

209.    Damages in this case are warranted. In *Carey v. Piphus*, 598 the Supreme Court held that "although mental and emotional distress caused by the denial of procedural due process itself is compensable under § 1983, neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused"[19].

210.    The Court noted in Carey that the primary purpose of the damages remedy in § 1983 litigation is "*to compensate persons for injuries caused by the deprivation of constitutional rights*".[20]

---

[17] Knight First Amendment Institute v. Trump (1:17-cv-05205) 2nd fed. Dist. Ct., Document 72 memorandum & Order, Filed 05/23/18 Page 66 of 75.

[18] Ibid at page 67 of 75

[19] Id. at 264

[20] Id. at 245

211.    **The fourteenth amendment remains pointedly here, a federal question to these Utah actors in denying *"any person within its jurisdiction equal protection of the laws*." U.S. Const. amend. XIV, § 1.

212.    That this vindication is a claim for relief as a constitutional guarantee that *"prohibits state and local governments from treating similarly situated persons differently*." *Rector v. City & Cty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003).

213.    That vindication under a claim for relief, is statutory fundamental guarantee that *"all persons similarly situated should be treated alike*." See - *City of Cleburne v. Cleburne Living Ctr*., 473 U.S 432, 439 (1985).

214.    This case arises also because in 1940, the Supreme Court held in *Cantwell v. Connecticut* 310 U.S. 296 (1940) that due to the Fourteenth Amendment, **the Free Exercise Clause is enforceable against state and local governments under the Incorporation Doctrine**.

215.    Defendants ongoing actions created these constitutionally based federal question jurisdiction claims.

216.    These claims had then– "arising under" – 'color of state law' action as censorship – as statutory violations and rights deprivations both—being the Rule 8(a) claim that contours a clearly established right of Speech where the focus is on *"whether the violative nature of particular conduct is clearly established*.'" <u>Perea</u>, 817 F.3d at 1204 (quoting *Mullenix v. Luna*, 136 U.S. 305, 308 (2015)).

217.    Plausibility of a claim has ceased to be an issue where these defendants, via the city communications director, has materially stated this censorship, as the prime ingredient of

this cause of action--and prior to discovery—began blocking this defendant on the city council Facebook page on October 23rd, 2014.

Further, *That anyone seeking the acquiesce of this court in their own particularized brand of failed government, citing Facebook policy, knowingly pretends to set aside a century of Supreme Court precedents in violation of clearly established rights, violations of their oath of office and in deprivation of clearly established constitutional rights of others! (emphasis added)*

218.   (class action) These violations appear to be additionally directed by outside professional interests foreign to the scope of Salt Lake's owed duty of Salt Lake to citizen's like Johnson (Utah chapter of the ACLU, Globus Relief, Catholic Charities, LDS Corp humanities, etc);

...SPEAKING ON IMMUNITY

219.   Lastly, immunity.  The Judiciary will resolve immunity questions prior to trial. Immunities only apply to individual capacity claims and are not available in official capacity or *Monell* claims.

220.   While qualified immunity is available to an official sued in his personal capacity, there is no qualified immunity available in an official capacity suit. The Supreme Court has held that a local government defendant has no qualified immunity from compensatory damages liability.[21]

221.   *"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory*

---

[21] Owen v. City of Independence, 445 U.S. 622 (1980).

*or constitutional rights of which a reasonable person would have known.*" *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

222.    The analysis of qualified immunity involves two questions. Question (1) asks "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001)[22].

223.    Question (2) asks if a constitutional right was "*clearly established,*" and in particular, "*whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.*"    Id. at 201-02. Officials are provided qualified immunity "*if their conduct does not violate clearly established statutory or constitutional rights.*" See *Mayfield v. Bethards,* 826 F.3d 1252, 1255 (10th Cir. 2016).

224.    Citing a 10th circuit court on point:

> "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." Tolan, 134 S. Ct. at 1865. "The first asks whether the facts, 'taken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a federal right.'" Id. (brackets omitted) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." Id. at 1866 (quotations omitted). "It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." Perea v. Baca, 817 F.3d 1198, 1204 (10th

---

[22] Violation of a clearly established state-law right does not defeat qualified immunity regarding the violation of federal law. Davis v. Scherer, 468 U.S. 183, 194 (1984).

Cir. 2016). Clearly established law "must be particularized to the facts of the case."
White v. Pauly, 137 S. Ct. 548, 552 (2017) (quotations omitted); see also D.C. v.
Wesby, 138 S. Ct. 577, 590 (2018) ("The clearly established standard . . . requires
a high degree of specificity." (quotations omitted)). "Of course, general
statements of the law are not inherently incapable of giving fair and clear warning
to officers, but in the light of pre-existing law the unlawfulness must be apparent."
White, 137 S. Ct. at 552 (citations and quotations omitted); see also Wesby, 138
S. Ct. at 590 ("[T]here can be the rare obvious case, where the unlawfulness of the
officer's conduct is sufficiently clear even though existing precedent does not
address similar circumstances." (quotations omitted)). "Courts have discretion to
decide the order in which to engage the[] two [qualified immunity] prongs." Tolan, 134 S.
Ct. at 1866 (quoting Pearson v. Callahan, 555 U.S. 223, 236 (2009)). "But under either
prong, courts may not resolve genuine disputes of fact in favor of the party seeking
summary judgment." Tolan, 134 S. Ct. at 1866. – cited in  McCoy v. Meyers, No. 17-3093
(10th Cir. 2018) at pp. 12-13

**And citing** *Kozel v. Duncan*, No. 10-7065 (10th Cir. 2011)

"*We review de novo a district court's decision to deny a summary judgment motion
that asserts qualified immunity.*" Citing Eidson v. Owens, 515 F.3d 1139, 1145
(10th Cir. 2008) - Where a summary of *Kozel v. Duncan*, No. 10-7065 (10th Cir.
2011) reads,

"*The court found that the Sheriff had qualified immunity from the Fourteenth Amendment
claim. But the court denied the Sheriff immunity in his individual capacity from the First and
Fourth Amendment claims. The Sheriff appealed the district court's decision to the Tenth*

> *Circuit. The Tenth Circuit found that there is authority that "arguably supports" the Sheriff's conduct, but that authority is not so clearly established "that a reasonable officer standing in [the] Sheriff['s] shoes would have recognized the unlawfulness of his conduct." The Tenth Circuit reversed the district court's decision that denied the Sheriff qualified immunity on Plaintiff's First and Fourth Amendment claims."* - https://law.justia.com/cases/federal/appellate-courts/ca10/10-7065/10-7065-2011-04-27.html (taken from the summary as cited)

225.    Undoubtedly defendants will make claims of "qualified immunity". Government officials performing discretionary functions are immune from suit if their conduct does not violate clearly established constitutional rights of which a reasonable person would know. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).

226.    Because of the nature of this city's non-stop campaigns about 'civil rights' and its personal connection with the ACLU—hiring outgoing attorneys and directors from the ACLU—plaintiff asserts, Plane and Biskupski DO NOT enjoy immunity under this doctrine.

227.    These defendant's peripheral connection and proximity to the *Knight First Amendment Institute v. Trump* (1:17-cv-05205) plaintiff—eliminates defendant's zero-sum-gain of feigning immunity. Defendants were on the sidelines of that case—were cheering on a former Salt Lake Tribune writer which they even a remote association to in that case.

228.    Defendant's own protected political dissent against the US President on the matter of free speech, sidelines a claim of qualified immunity. Defendants are accountable to their conflicted choices to both admonish and support those who sue the president over free speech while they actively used their own illegal policies and practices in the administration of Salt Lake to block the plaintiff's free speech.

229.    Wouldn't the hypocrisy otherwise, be overwhelming on this judiciary.

230.    This deceptiveness of defendants actions identified here for this judiciary, are nearly
identical in proximity to the *Knight First Amendment Institute v. Trump* (1:17-cv-05205) case
describing the illegal conduct of this social media policy; that defendants were critically aware
of and on the periphery of that same case; that the same litigious ACLU consensus concerning
that case—establish defendant's conduct as plainly egregious so that no reasonable person
could have even imagined they were acting lawfully in the implementation of Salt Lake's
invalid, contrived, unconstitutional social media policy.

231.    Whether the law was clearly established should not be assessed at a high level of
generality in this case as it concerns immunity—though established precedent of May 23rd
2018 is clearly cited here and is assed at a very high level indeed—arriving via s Judge Naomi
Buchwald of the 2nd District Court's memorandum and ruling order in that Trump/Twitter
case: *Knight First Amendment Institute v. Trump.*

232.    It is beyond question that at least defendant Plane and Wharton—if not all defendants
listed—more pointedly for Wharton and Plane as attorneys – that they indisputably
understood with an innate comprehension whether an objectively reasonable person would
have known that the complained of social media conduct was unconstitutional based on the
specific facts and circumstances of the cities social media policy—especially that hey
continued blocking the plaintiff after the *Knight First Amendment Institute v. Trump* decision
they had all cheered on and watched unfold!

233.    That these defendant were confronted with the same-ness of exclusions by blocking; that
the type of mentioned 'blocking' in the *Knight First Amendment Institute v. Trump* as

unconstitutional concerned the nearly identical sameness of that cases social media policies - see *Mullenix v. Luna*, 136 S. Ct. 305 (2015) as practiced by these defendants—all of them.

234.    A claim concerning a constitutional deprivation seeks vindication enforceable through jurisdictional authority of the District Courts, against State or local municipal intrusion.  The 'on point precedent' of the Supreme Court, held in *Cantwell v. Connecticut*, 310 U.S. 296 (1940), "*that due to the Fourteenth Amendment, the Free Exercise Clause is enforceable against state and local governments as the vehicle through which the Court applies the Bill of Rights to the states known as the Incorporation Doctrine*".

235.    A reasonable person would know this.  More so, licensed attorney(s) Plane and Wharton pointedly and emphatically understand free speech deprivations are unlawful—under precedents of law—as enforceable upon the states through precedents such as *Cantwell v. Connecticut,* etc.

236.    This case argues on point removal of qualified immunity to the city and its actors. This case is a case in point concerning the violation of clearly established rights of speech— violated in "but-for" fashion as a form of retaliation as bias and prejudice underlying these violations.

237.    Qualified immunity PRONG (2): whether A right is clearly established. "A right was clearly established. It was clear—crystal clear—to a former civil rights icon in Utah acting as the former ACLU director!

238.    Plane understood her conduct was unlawful, citing." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1308 (10th Cir. 2015) (quotation omitted), petition for cert. filed, 84 U.S.L.W. 3484 (U.S.

Feb. 22, 2016) (No. 15-1076). In terms of a properly plead case within the four corners of the constitution complaint...!

> "*Generally "this means that there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.*" - Appeal from the United States District Court for the District of Colorado (D.C. No. 1:13-CV-01642-WJM-KLM (2016)) pp. 8-9

239.   This complaint as constituted has provided at least "*Supreme Court or Tenth Circuit decisions on point, or the clearly established weight of authority from other courts e.g., the Kingt/Trump case in the 2nd District showing the law to be as the plaintiff maintains*".

240.   The law is also clear as on point 10th circuit ruling: the First Amendment recognizes, and protects against, even *de minimis harms.* See *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016) (rejecting an argument of "de minimis" First Amendment harm and approving an award of nominal damages); Lippoldt v. Cole, 468 F.3d 1204, 1221 (10th Cir. 2006) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013).

241.   "[S]tate employment is generally sufficient to render the defendant a state actor."  Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 935 n.18 (1982)[23]. In this case, Salt Lake presents a special problem of a conflicted allegiance to the government and U.S. Constitution by virtue

---

[23] Special problems may arise if the public employee in question has a professional obligation to someone other than the government.

of Planes obligation to outside government interests as the Utah chapter of the ACLU; that

upon information and belief, Mayor Biskupski has an outside interest to other professional

associations as outside obligations negating her role overseeing the city's legal department;

242.    This complaint alleges it constituted exceeds a *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955,

1965 (2007) standard where Plaintiff's allegations of a violation of a clearly established right

did "*raise a right to relief above the speculative level*"[24].

243.    Despite this, plaintiff enters the following on Pleading Requirements:  In *Leatherman v.*

*Tarrant County Narcotics Intelligence & Coordination Unit*[25] the Supreme Court unanimously

rejected the "*heightened pleading standard*" in cases alleging municipal liability.

244.    as example, the S. Court held that the lower Dist. court had erroneously upheld the

dismissal of a complaint against a governmental entity for failure to plead with the requisite

specificity.[26]  While leaving open the question of "whether our qualified immunity

jurisprudence would require a heightened pleading in cases involving individual government

officials,"[27] the Supreme Court refused to equate a municipality's freedom from respondeat

superior liability with immunity from suit.

## VI. CAUSES OF ACTION

COUNT 1: 42 U.S. CODE § 1983 - Violation of The Right to Free Speech Under The First And
Fourteenth Amendments of The U.S. Constitution -  As Applied to All Defendants

---

[24] Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).
[25] 113 S. Ct. 1160 (1993).
[26] Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 954 F.2d 1054, 1058 (5th Cir. 1992).
[27] Leatherman, 113 S. Ct. at 1162

245.   Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set
       forth in this listed count;

246.   This count applies to the following defendants:

       1) public forum established by the Salt Lake City Council as constituted at:
          https://www.facebook.com/slcCouncil/ and maintained by SLC employee, Amy
          Farmer;

       2) public forum established by the Salt Lake City Human Rights Commissionas
          constituted at: https://www.facebook.com/SLCHumanRightsCommission/

       3) defendant Wharton whose official page is constituted at:
          https://www.facebook.com/ChrisWhartonSLC/ (see attached exhibits 1-7)

       4) defendant Wharton whose private page was then designated as a public forum is as
          constituted at https://www.facebook.com/therealchriswharton - seemingly
          Wharton and Trump both use the moniker "the real" to describe themselves. The
          parody of Wharton has created an additional link between the Knight
          Foundation/Trump lawsuit (May 23rd 2018) and Councilman Wharton who
          understood the implications of that lawsuit and is on information and belief, also on
          the periphery of that lawsuit by connection to one of that suits plaintiff's!

       5) defendant Mendenhall whose private page was then designated as a public forum is
          as constituted at https://www.facebook.com/ErinForCouncil/  for the purposes of
          Mendehall who has now just opened her page for comment -

       6) defendant Kitchen whose usage of a 'Derek Kitchen' pages expressly for conducting
          political activity on behalf of the city, as [they] are constituted at

https://www.facebook.com/votederekkitchen/ ,

https://www.facebook.com/derek.kitchen

247.   A limited public forum is one "*created for a limited purpose such as use by certain groups
. . . or for the discussion of certain subjects*."  Perry Educ. Ass'n v. Perry Local Educators' Ass'n,
460 U.S. 37, 71 n.7 (1983).

"*Once it has opened a limited forum,*" the government "*must respect the lawful
boundaries it has itself set.*"  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S.
819, 829 (1995).

248.   Salt Lake City created public forums, as evidenced in the defendants' sections, yet had
disrespected the lawful boundaries they had themselves set after creating these forums for
the express purpose of "*discussion of certain subjects*" related to the operation of the city,
city plans, city developments and city political discussions.

249.   The allegation of censorship as pled are defendants' material actions. They are
supplemented as material facts from conversations with Salt Lake City employees as to the
date the blocking on these forums had occurred, being 23 OCT 2014;

250.   That defendants' ignoring the rules it had itself set on these forums, then violated the
meaning of their intentioned commitment to, "***a profound national commitment to the
principle that debate on public issues should be uninhibited, robust, and wide-open***."  *New
York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

251.   that fact-based admissions by the city and its officers are beyond mere "*labels and
conclusions*" as "*a formulaic recitation of the elements of a cause of action*" in being
insufficient", citing the heightened pleading standard of *Twombly* Id. at 555

252.    Defendants' blocking of the Plaintiff from the individual (1) The official city council page, and that of Defendant's (2) Chris Wharton, (3) Derek Kitchen and (4) Erin Mendenhall violates the First Amendment because it imposes a viewpoint-based restriction on the Plaintiffs' access to, and participation on these respective public forums.

253.    Defendants' blocking of the Plaintiff from the individual (1) The official city council page, and that of Defendant's (2) Chris Wharton, (3) Derek Kitchen and (4) Erin Mendenhall account(s) violates the First Amendment because it imposes a viewpoint-based restriction on the participating public's right to hear, too engage and respond.

254.    Defendants' social media policy resulting in blocking of the Plaintiff from the City council page under a policy maker function of Salt Lake's government body – a supervisory direction of defendant Margaret Plane in violates the First Amendment because it imposed a viewpoint-based restriction on the Plaintiffs' access to, and participation on the city of Salt Lake's primary city council public forum.

255.    Defendants' blocking of the Plaintiff from the City council page by a policy maker function of Salt Lake's government body is a supervisory policy of defendant Margaret Plane, it violates the First Amendment because the unconstitutional social media policy imposed a viewpoint-based restriction on the participating public's right to hear, too engage and respond.

256.    Defendants' blocking of the Plaintiff from these Facebook page violates the First Amendment because it imposes a viewpoint-based restriction on the Plaintiffs' ability to petition the government for redress of grievances.

257.    Speech utilizing Facebook and other social media is subject to the same First Amendment

protections as any other speech.  Packingham v. North Carolina, 137 S. Ct. 1730 (2017); Bland

v. Roberts, 730 F.3d 368 (4th Cir. 2013).

258.    The First Amendment represents "*a profound national commitment to the principle that*

*debate on public issues should be uninhibited, robust, and wide-open*."  New York Times v.

Sullivan, 376 U.S. 254, 270 (1964).  Today, "*the most important places … for the exchange of*

*views… is cyberspace … and social media in particular."*  Packingham v. North Carolina, 137 S.

Ct. at 1735 (internal citation omitted).  See also Reno v. American Civil Liberties Union, 521

U.S. 844, 868 (1997) (acknowledging the "***vast democratic forums of the Internet***").

259.    "[T]he First Amendment forbids the government to regulate speech in ways that favor

some viewpoints or ideas at the expense of others." Lamb's Chapel v. Center Moriches Union

Free Sch. Dist., 508 U.S. 384, 394 (1993).  Therefore, when a government creates a limited

public forum for speech, in either a literal or "metaphysical" sense, see Rosenberger v. Rector

& Visitors of Univ. of Va., 515 U.S. 819, 830 (1995), there are important constitutional

constraints on the limitations on speech that the government may apply to such forums.  "The

State may not exclude speech where its distinction is not reasonable in light of the purpose

served by the forum," Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of

the Law v. Martinez, 561 U.S. 661, 685 (2010), and the government may not "discriminate

against speech on the basis of … viewpoint." Rosenberger, 515 U.S. at 829.

260.    "The existence of reasonable grounds for limiting access to a nonpublic forum … will not

save a regulation that is in reality a façade for viewpoint-based discrimination."  Cornelius v.

NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 811 (1985); see also Davison v. Loudoun

Cty. Bd. of Supervisors, No. 1:16CV932 (JCC/IDD), 2017 WL 3158389, at *10 (E.D. Va. July 25, 2017).

261.    The façade is evident here: Defendants did not, in policy or practice, uniformly bar Utahans from posting off-topic comments that lauded the defendant(s) various initiatives, supported his policy initiatives (whether the subject of a post or not), or in a commenter repeated similar positive commentary. Similarly, defendants do not, in practice, delete non-offensive or non-insulting comments – particularly when made by posters supportive of these defendants.

262.    Instead, the Social Media Policy was drafted to allow Defendants to exercise arbitrary and unfettered discretion to delete comments, or block commenters of which they did not approve, under the guise of deeming them "off-topic," "repetitive," "offensive" "unacceptable", or basically—as a vicarious act of blame shifting its own state actions of censorship onto a non-state actor as the Facebook corporation simply by citing Facebook policy as non-Facebook employees.

263.    The Supreme Court has long recognized that "*words are often chosen as much for their emotive as their cognitive force,*" and that "*we cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process.*" Cohen v. California, 403 U.S. 15, 26 (1971).

264.    The First Amendment forbids the government from censoring speech based on "***personal predilections,***" and "***the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us.***" Id. at 21, 25 in the form of blocking access as these defendants have.

76

265.   The Supreme Court has confirmed "*time and again*" that '*the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers*.'"  *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (quoting *Street v. New York*, 394 U.S. 576, 592 (1969).

266.   By banning Plaintiff an ability to comment, Defendants directly and implicitly chilled Plaintiffs' free expression as political dissent and participation without substantive due process remedy or relief.

267.   Defendants violated a clearly established constitutional right – the right to speak freely on topics relevant to the government in a government-established forum, and particularly an online social-media-based forum – of which all reasonable government officials should have known, rendering them liable to Plaintiffs under 42 U.S.C. § 1983.  See <u>Packingham v. North Carolina</u>, supra, at 1735 (it is *"clear" that "the most important places" for the exchange of views are social media sites such as Facebook"*); Page v. Lexington Cty. Sch. Dist. One, 531 F.3d 275, 284 (4th Cir. 2008).

268.   Conversely in this case of lower level government officials, "*It is emphatically the province and duty of the judicial department to say what the law is*," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and even in the case of President Donald Trump, the Judiciary has held that the President's blocking of the individual plaintiffs in <u>*Knight First Amendment Institute v. Trump (1:17-cv-05205)*</u> is unconstitutional under the First Amendment.

269.   Plaintiff also alleges that these defendants' behavior not covered by absolute immunity. Absolute immunity does not apply to such conduct, and thus if you find that these defendants engaged in such conduct, you should consider it in determining defendant's liability.

270.   The denial of constitutional rights is irreparable injury per se, and Plaintiff is entitled to declaratory, injunctive and compensatory relief.

COUNT 2: 42 U.S. Code § 1983 - Discrimination as A Denial Of Equal Protection

271.   Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

272.   Plaintiff brings a claim of discrimination under the Fourteenth Amendment's Equal Protection Clause.  This Section § 1983 equal protection claim, alleges plaintiff is intentionally treated differently than others similarly situated in Salt Lake and there is no rational basis for the disparate treatment - see   *Olech v. Village of Willowbrook,* 528 U.S. 562 (2000).

273.   Plaintiff complained he had suffered injury of un-equal treatment and retaliation as violations of U.S. Const. amend. XIV, § 1, pursuant a constitutional guarantee that "*prohibits state and local governments from treating similarly situated persons differently*".

274.   This blocking has treated the Plaintiff different, unequal, than others situated in the same class of city residents.

275.   Plaintiff seeks a declaration of this court, citing how Salt Lake City has violated the constitutional provisions of the 'Equal Protection Clause' as enforceable to the states under the Incorporation Clause of the Fourteenth amendment; that Salt Lake's social media policy as invalid, created a discrimination of unfair and unequal treatment now vindicated under 42 U.S. Code § 1983.

276.   Plaintiff seeks a ruling that the governmental body, its policy's its policy makers as a practice, policy and custom, have violated his constitutional rights of speech as they relate to

an 'Equal Protection' under the laws as applied to the states under the Fourteenth Amendment.

### COUNT 3: Section 1983 - Liability in Connection with the Actions of Another - Municipalities Liability Through Inadequate Training or Supervision

277.    Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

278.    When a supervisor with policymaking authority is sued on a failure-to-train theory, the standard appears to be the same as for municipal liability.  See *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005) ("*A supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact.*"); see also infra Comment 4.6.7 (discussing municipal liability for failure to train). This is the case here.

279.    Plaintiff claims that Salt Lake adopted a policy of [inadequate training with respect to defendant Fullmer] and [inadequate supervision with respect to council members and the city communications department], and that the social policy at question, caused the violation of plaintiff's specify rights as enumerated in this complaint.

      a.    First: Salt Lake's training program concerning social media exclusions are inadequate to train its employees to carry out their duties and decisions of constitutionally liable based decision making. Salt Lake failed adequately to supervise its employees in the communications department because Salt Lake City council claims to be the supervisory body of the communications department for the city council social media sites. This means Salt Lake had no supervisory role where the council claims to be

operating the communications department for the council Facebook page. Therefore, Salt Lake City failed to provide any direct supervision and instead—the communications department Dan Wiest and Amy Farmer believed they were supervised at the discretion of the city council instead!

b. Second: Salt Lake's failure to [adequately train Wiest and Fowler and Fullmer] means Salt Lake had also failed to [adequately supervise Wiest and Fowler and Fullmer]. This amounted to deliberate indifference to the fact that inaction would obviously result in the violation of plaintiff's enumerated rights set forth in the complaint.

c. Third: Salt Lake's failure to [adequately train] [adequately supervise] proximately caused the violation enumerated within this complaint

280. Defendant Brian Fuller, a city employee, also failed to act properly due to his lack of training from the city. This lack of training persisted throughout two separate councilors terms: former council member, Stan Penfold and Chris Wharton's term begun in 2018.

281. Both of these councilors had engaged in a social media policy creating the unconstitutional behaviors complained of to the city, to the council, to the council chair and to the mayor--without any consequences at any time!

282. Despite the added numerous fair warnings filed with the Salt Lake City recorder's office and legal department, the application of an unconstitutional social media policy—leading to blocking plaintiff on these referenced Facebook forums—continued unabated.

283. When these third district councilors were engaged in viewpoint censorship on their social media sites—Fuller was aware of the violations as they occurred due to his proximity to these councilors engaging int this behavior.

284.    To some degree, Fuller then participated in the violations as he was aware of them, failed to stop them, failed to notify others to stop them and had acquiesced to their occurrence in full. Fuller is alleged herein as rude, curt and blocks access to the city council members.

285.    The Salt Lake City councilors themselves, are running an ad-hoc viewpoint censorship program without any city oversight or specific or specialized training by Salt Lake's legal department.   Other than a reliance upon a social media policy crafted by a non-attorney in the communications department—the Salt Lake City council is acting as a governing body usurping the role of Salt Lake as the governing body.

286.    Alternatively, Salt Lake City council has provided no training or oversight in the implementation of an unconstitutional social media policy.

287.    Unlike the city's communications department director routinely confers with the legal department (Plane as supervisory authority on the governing body's policies) on the implementation of social media policy.

288.    There is no such plan, practice or policy for the individual councilor's own moderation of their respective Facebook pages as either official in scope—or those made official which had—just like in the case of the *Knight Foundation* lawsuit-- shifted the councilors private pages into the public forum and the public domain.

289.    Concerning each of these council sites—no training exists by Salt Lakes governing body as a prima facia failure to train claim herein;

290.    This vast differential in policy making for a government body shirks the responsibility of training—and has created liability on the city.

291.    This liability is that of the city council using a legally bound resource from the city as a communications director to implement the cities social media policy only for the City Council primary Facebook page—while no further training or policy is implemented by the city itself for the individual councilors or individual sites in the public space!

292.    Plane's and Biskupski's actions as [failing to train] are well documented by a lack of documentation.

293.    Fullmer's own individual action in failing to act, dates back to Councilman Stan Penfold's own viewpoint-censorship complained of to the city council numerous times because Fullmer had no training to act.

294.    An individual who is present or becomes personally aware of the civil rights deprivation and fails to intervene to prevent others from violating a person's constitutional rights is liable under Section 1983 - see *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972).

295.    Defendant Mendehall is liable as the city council chair as she has usurped the role of the city in claiming Dan Wiest—as communications director running the city council social media sites—is beholden to the council itself and—despite Wiest is a city employee on the city payroll.

296.    Mendehall as the chair of the city council, is painfully aware of this persistent viewpoint censorship she has authorized to Wiest in the usurped role of dictating his terms of employment far outside the scope of the city. After all- Mendenhall has engaged in viewpoint censorship herself for over a year.

297.    First: [Salt Lake as a Governing body] or [Plane as a policymaking official] knew that its employees would confront particular situation with respect to its social media policies.

82

298.   Second: The situation involved [a matter that employees had a history of mishandling].

299.   Third: The wrong choice by Mendenhall with respect to Wiest and the communications department at the council also compounded The wrong choice by Plane with respect to allowing Mendenhall to wrongly oversee constitutional law as it applied to an unconstitutional social media policy and that these issues and failures of a governing body ultimately reflected The wrong choice by Biskupski in that situation to abate or address the cause deprivation to the plaintiff as enumerated in this complaint.

## COUNT 4: Supervisory Liability Under Monell

300.   Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

301.   Supervisory liability can be imposed without a determination of municipal liability. Supervisory liability naming defendants Biskupski, Plane runs against the individual, is based on his or her personal responsibility for the constitutional violation and does not require any proof of official policy or custom as the "moving force" behind the conduct. *"[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates."*[28] As with a local government defendant, a supervisor cannot be held liable under § 1983 on a respondeat superior basis,[29] although a supervisory official may be liable

---

[28] Clay v. Conlee, 815 F.2d 1164, 1170 (8th Cir. 1987).
[29] Monell v. Department of Soc. Servs., 436 U.S. 658, 694 n.58 (1978).

even where not directly involved in the constitutional violation[30]—as is the case with both

Plane and Biskupski.

302.     In this case, the conduct of the communications department staff (Wiest and Farmer) are

"affirmatively link[ed]" to the action or inaction of the supervisory official as the policy maker

for the government body itself.

303.     Since supervisory liability based on inaction is separate and distinct from the liability

imposed on the subordinate employees for the underlying constitutional violation, the level

of culpability that must be alleged to make out the supervisor's liability may not be the same

as the level of culpability mandated by the particular constitutional right involved.

304.     A number of circuits use the Supreme Court's analysis in City of Canton v. Harris[31] as an

analogy in determining whether a supervisory official is deliberately indifferent to the

violation of constitutional rights. In Shaw v. Stroud,[32] the court held that a three-prong test

must be applied in determining a supervisor's liability.

305.     (1) that the legal director for Salt lake City is the final supervisor of the social media

policies and had actual and constructive knowledge that its subordinates, Dan Wiest and Amy

Farmer,   was engaged in conduct of blocking the plaintiff that posed "a pervasive and

unreasonable risk" of constitutional injury to citizens like the plaintiff;

306.     (2) that the legal director for Salt Lake City is the final supervisor's response to that

knowledge was so inadequate when continually provided fair warning, continually provided

additional notice as remarks directed at the Mayor on her own Facebook pages, and the

---

[30] Wilks v. Young, 897 F.2d 896, 898 (7th Cir. 1990).
[31] 489 U.S. 378 (1989).
[32] 13 F.3d 791 (4th Cir. 1994).

express and implicit knowledge of _Knight First Amendment Institute v. Trump_ (1:17-cv-05205) — that Planes knowledge of all this showed a **_"deliberate indifference to or tacit authorization of the alleged offensive practices"_**; and

307.    (3) that there is an "affirmative causal link" between the failure to train and supervise the legal ramifications of any city departments actions as they relate to the deprivation of others constitutional rights. In this case, the implementation of an unconditional social media policy.

308.    Two factors aid courts in considering whether conduct is shocking: (1) whether there was time for reflection and (2) whether there were competing governmental needs.  In this case, liability is warranted for a deliberate indifference owing to the lynchpin of censorship coming



from a known and admitted reliance on defendant Plane as the city legal advisor to the Facebook moderator Dan Wiest as the communications director—Plane was a former ACLU director with intimate knowledge of the entire breadth and scope of what constitutes clearly established rights at issue here.

309.    Upon information and belief, Plane, Biskupski and Wharton are intimately aware of at least one of the active Plaintiff's in *Knight First Amendment Institute v. Trump* (1:17-cv-05205), perhaps even on a first name basis with the pictured Plaintiff from that landmark Lawsuit.

310.    Because of this professional interplay of ACLU personalities, the close proximity to both the Salt Lake Tribune covering these stories and the Utah ACLU creating stories of 'fair warning lawsuits' arising our of viewpoint censorship—and the proximity of the Salt Lake Tribune covering the initial and resulting news of the *Knight First Amendment Institute lawsuit*—AND—the Utah ACLU announcing in 2017 its statewide warning to elected officials in Utah's delegation not to censor constituents on Social Media (the actual ACLU warning coinciding with the initiation of a federal cause of action by Plaintiff's *Knight Foundation* in the Trump/Twitter lawsuit) SLC Tribune  writers (specifically the pictured plaintiff) had been for almost a year consorting on this news story while Salt Lake City was already engaged in—at a time these defendants under the supervisory control of the legal director and the mayor—did further engage in additional viewpoint censorship to this Plaintiff (Johnson) by defendant Wharton in that ACLU/Tribune/Knight Foundation Plaintiff.

311.    The SLC Tribune continues to act as the continued public media trumpet of the Utah ACLU while refusing to cover the identical story as it occurred in Salt Lake. The CLU of Utah was

made aware of this lawsuits viewpoint censorship—on more than one occasion—by posts to numerous types of statements.  These statements were made publicly on the national ACLU Facebook page, the Mayor's Facebook page, the former owners of the Salt Lake Tribune page as Michael Kearns, the Utah Senate, the Utah House of representatives, etc.

312.   At some point, the story of the pervasive nature of Utah's censorship, was a paid promoted story on the Facebook platform. The story ran until those associated with the story complained. At which time, the Facebook corporation continued to allow the post—but would no longer allow the paid promotion of the content surrounding the story.

313.   Plane's indifference is shocking to the conscience, as is defendant Biskupski' s, and Wharton's. Thiers represents a failed "professional judgement" standard as it is applied to the complete lack of substantive due process of these defendants revoking the clearly established right of speech—without any substantive due process. Due process was neither offended-nor made available after numerous requests to restore these rights.

314.   This plaintiff's attached news-story, "DATELINE: The Second Coming of Censorship" used the attached ACLUUTAH.ORG picture as posted from its Facebook site and, plaintiff ran the picture above—attached to his own Utah story--as a paid promotion on the Facebook platform—sharing it across multiple Facebook sites as explained in seeking a remedy for censorship without litigation.

315.   It is attempts to avoid litigation—in the interest of justice and the conservation of the

courts time—going to the heart of this city's administrative hubris and indifference. It is

marked by defendant Plane and Biskupski both.  Both these defendants critically knew of

Utah's ACLU fair warning—its coverage was provided widely by the entire commercial

spectrum of Utah's media establishment at the time the _Knight Foundation_ would be filing

against a U.S. President's Twitter feed—and brining the case via at least one a plaintiff known

to ACLUUTAH.ORG as a recent and former staff writer for the SLC Tribune.



ACLU of Utah - Don't Block Constituents on Social
Media, ACLU of Utah Warns Federal Delegation
"Because your social media pages are a public forum, your blocking of these
individuals is an unconstitutional restriction on their right to free spee...
ACLUUTAH.ORG

_Figure 2: ACLU's 'fair warning' is pictured here, dated Aug 29, 2017_

316.   Plaintiff's story attached to the ACLUUTAH.ORG's August 2017 'fair warning' is as follows:

DATELINE: Utah's Second Coming of Censorship.

Truth Bomb...get the digs on the abortuary of public forum bans!

IN what some are calling an abortion of speech and rights---this post calls out the local ACLU Utah chapter at the top of this list.

Long before the image graphic below was even created-Afghan Scene had contacted a real ACLU chapter about a 'one-off' poser here getting bent on speech. Here's the rest of our list...

...The S.J. Quinney College of Law - for the speech anemic and constitutionally impaired.

...The Utah State Bar -- not so much of a shocker!  Perhaps the biggest bunch of sore losing cock blockers under its current bar president.

...Governor Gary HerBot as we like to call him. The Lil' Abner of mediocre values.

...Lt. Governor Cox.  Spencer J. Cox gets an honorable mention here as his cock-blocking fresh-faced-faith ways did so live streaming from the USS Arizona War Memorial! Cox blocked a veteran while jerking off the Facebook audience as his salute to service!

...The Utah Attorney General--Bishop Sean D. Reyes. No wonder Bishop Reyes' predecessors both had been indicted, back to back, on public corruption charges!

... Utah Speaker of the House, Greg Hughes. A ding-dong of the liberty bell from Philadelphia as his hometown of freedoms didn't translate into braving political dissent on public forum's Facebook Engineering page!

...Alt right[s] icon Utah Senate Jim Dubakis

...Salt Lake City Council blocked access on its public Facebook forums. Yes, the city of "welcoming acceptance" as the alt-right[s] equality capitol gets a little sideways about political dissent.

While this council's city is overseen by former Utah ACLU director Margaret Plane--Plane's own pet project dubbed the @SLCHumanRightsCommission is another falsetto of "human rights" blocking political speech and dissent.  It's never been about water fountains, Plane. It's about the constitution.

Plane was the former director of the same constitutionally impaired one-off ACLU here. No wonder they call it a staff infection...

89

.CS

317.   In fact—few people associated to this current case as filed, can claim ignorance of this case's specific facts and the additionally pending case 2:19-CV-00029.

318.   Their own 'fair warning' seeking resolution without litigation was—in the interest of heading off litigation-- plastered in the public space without any resolution whatsoever and—in the case of the City Council's censorship—dated to 2014!

319.   Plaintiff seeks this judiciary declare defendants Plane, Biskupski and Wharton—knew of and had intimate knowledge of an identically situated lawsuit against their political adversary—the US President—yet continued to block others even as they cheered on one of the Plaintiff's in the Knight Foundation lawsuit litigated in the 2nd Fed. Dist of New York!

320.   Alternatively-that defendant Plane be held accountable for the action of failing to provide substantive due process in the revocation of this plaintiff's clearly established right of speech on the defendants designated Facebook forums.

COUNT 5: Section 1983 – Liability in Connection with The Actions Of Another – Failure to Intervene

321.   Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

322.   Plaintiff contends that Salt Lake's communications department employees [violated plaintiff's rights of speech, equal protection and due process] and that Margaret Plane should be liable for that violation because Margaret Plane failed to intervene to stop these violations.

323.   Margaret Plane is liable for these violations if plaintiff proves each of the following four things by a preponderance of the evidence:

324.   First: Salt Lake's communications department employees violated plaintiff's rights of speech, equal protection and due process in the act of blocking which arose from the use of an unconstitutional social media policy.

325.   Second: [Margaret Plane] had a duty to intervene. Plane as the top legal advisor for the City of Salt Lake, has an affirmative duty to intervene—as well a duty of care-- to prevent the violations of anyone s rights of the city concerning a social media policy she advises on and gave consent for. Plane failed to intervene in this policy as it was executed by those she overseas conceding legal decisions of the city creating liability.

326.   Third: Plane had a reasonable opportunity to intervene. Plane had an opportunity to intervene when the civil rights deprivation occurred on or about 23 October 2014 and did not. Plane had opportunity to intervene after this date and did not. Plane had opportunity to reverse these policies after a fair warning was filed with the city recorder's office as a notice of intent to bring suit—and did not. Finally, Plane had the opportunity to intervene when the Knight Foundation - Trump/Twitter blocking case was announced on May 23rd 2018—and did not

327.   Fourth:  defendant Margaret Plane failed to intervene.

COUNT 6: Section 1983 – Liability in Connection with The Actions of Another –  Municipalities

328.   Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

329.   This case unquestionably involves official policy

330. "[M]unicipalities and other local government units [are] included among those persons to whom § 1983 applies." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978) (overruling in relevant part *Monroe v. Pape*, 365 U.S. 167 (1961)).

331. However, "*a municipality cannot be held liable under § 1983 on a respondeat superior theory.*" Id. at 691.60

> "*Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury  that the government as an entity is responsible under § 1983.*" Id. at 694.61

332. There are several ways in which a municipality can cause a violation and thus incur liability as cited in this claim against defendant Plane:

333. Ordinarily, proof of municipal liability in connection with the actions of ground-level officers like the Salt Lake City communications personnel, will require, inter alia, proof of a constitutional violation by one or more of those officers—such as the unconstitutional social media polices as proof of a city employees actions resulting in blocking as a constitutional violation.

334. Because "*There cannot be an 'award of damages against a municipal corporation based on the actions of one of its officers if the jury concludes that the officer inflicted no constitutional harm.'*") (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)) – count eight relies upon the finding of the court or jury on count one.

335.    If count one is found to have violated the plaintiffs rights of speech, then Plane is liable for the actions of the communications personnel's use of a social media policy Plane ultimately oversees as the legal director.

336.    And that *Monell's* 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective" See Los *Angeles County v. Humphries*, 131 S. Ct. 447, 453-54 (2010).

337.    Because the showing that the existence of Salt Lake's official policy or custom as a social media policy was used in these constitutionally derived deprivations of rights to the plaintiff, plaintiff has then proved "*that the municipal practice was the proximate cause of the injuries suffered*".

338.    Further, In the case of this failure-to-train claims proof of deliberate indifference, the evidence that shows deliberate indifference demonstrates causation as well.

339.    It should be clear in this count that a municipality's legislative action (ordinances and social media policies) constitutes government policy. ***"No one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy*.**" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).

340.    Likewise, if the legislative body delegates authority to a municipal agency or board, an action by that agency or board also constitutes government policy. See, e.g., *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 660-61 & n.2 (1978)

(describing actions by Department of Social Services and Board of Education of the City of New York); id. at 694 (holding that "this case unquestionably involves official policy").

341.    When this judiciary examines this case, it may reflect on failure-to-train cases relevant to this count. It may observe that in this case, because of the indifference situated in the legal department of Salt Lake City, that the likelihood that the situation will recur and the predictability that the communications personnel as city employees are lacking the specific training, oversight and tools to handle that situation that resulted in the violation of a citizens' rights; that this court can justify a finding that Plane's policymaking decision not to train the communications personnel reflected "deliberate indifference" to the obvious consequence of her—as the policymakers' choice – namely, a violation of a specific constitutional or statutory right.

342.    The high degree of predictability may also support an inference of causation – that the municipality's indifference led directly to the very consequence that was so predictable - see *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409-10 (1997).

### COUNT 7: Section 1983 –Liability in Connection with The Actions of Another – Choice By Policymaking Official

343.    Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

344.    A deliberate choice by an individual government official constitutes government policy if the official has been granted final decision-making authority concerning the relevant area or issue.

345.    The [governing body] of the Salt Lake City is a policymaking entity whose actions represent a decision by the government itself.  The same is true of an official or body to whom the [governing body] has given final policymaking authority:  The actions of that official or body represent a decision by the government itself. Thus, when [governing body] or [policymaking official] make a deliberate choice to follow a course of action, that choice represents an official policy.  Through such a policy, the [governing body] or the [policymaking official] may cause a violation of a federal right by:

      i.   Defendant's Biskupski and/or Plane directed that the violation of blocking occurred as it relates to the social media policies of its governing body,

      ii.  Defendant's Biskupski and/or Plane authorized the violation of blocking as it relates to the social media policies of its governing body,

      iii. And both Defendant's Biskupski and Plane agreed to a subordinate's decision to engage in blocking  as a violations as it related to the social media policies of the city.

346.    Therefore, Plaintiff seeks judgement and declaration that If you find that such an official social media policy was the cause of and the moving force behind the violation of plaintiff's rights as described in this complaint, then it has found that Salt Lake City caused that violation.

**COUNT 8: Declaratory Judgment and Injunction (28 U.S. Code § 2201, et seq.)**

347.    Plaintiff repeats the allegations set forth in each paragraph of this complaint as if fully set forth in this listed count;

95

348. An actual controversy has arisen and now exists between Plaintiff and Defendants concerning Plaintiffs' rights under the United States Constitution.

349. A judicial declaration is necessary and appropriate at this time as to all counts.

350. Plaintiff seeks a judicial determination of a right against Defendants as they pertain to Plaintiffs' right to speak on the Facebook Page without being subjected to unconstitutional policies that impose prior restraints on speech, give government officials unfettered discretion whether to allow expression and under what conditions, and that are vague, overbroad, and not narrowly tailored to serve a substantial governmental interest.

351. To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the Social Media Policy to be unconstitutional as applied to the Plaintiff.

352. To prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment issue, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring the Social Media Policy to be unconstitutional on its face.

353. Pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, this Court should issue a permanent injunction prohibiting the Defendants from enforcing the restrictions in the Social Media Policy on citizens' expressive activities to the extent they are unconstitutional and to prevent the ongoing violation of constitutional rights.

354. The law is also clear as on point 10th circuit ruling: the First Amendment recognizes, and protects against, even *de minimis harms.* See *Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 805 (7th Cir. 2016) (rejecting an argument of "de minimis" First Amendment harm

and approving an award of nominal damages); *Lippoldt v. Cole*, 468 F.3d 1204, 1221 (10th Cir. 2006) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013).

355.   This injury in fact 'arises under' Federal Question jurisdiction concerning this case's controversy requirements, see *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

356.   Defendants' blocking of the Plaintiff from each of the defendant's public forums and accounts violates the First Amendment because it imposes a viewpoint-based restriction on the Plaintiff's ability to petition the government for redress of grievances.

357.   Defendants' blocking of the Plaintiff from each of the defendant's public forums and accounts violates the First Amendment because it imposes a viewpoint-based restriction on the public's right to hear.

358.   Plaintiff and others are suffering irreparable harm from continued enforcement of unconstitutional policies of this governmental body and its policy makers, where monetary damages alone are inadequate to remedy this harm; and where the balance of equities in this case are in the public interest and favor a grant of immediate injunctive relief.

### VII. PRAYER FOR RELIEF

WHEREFORE, this Plaintiff requests the following of this Court:

1. Provide declaratory relief pursuant 28 U.S. Code § 2201 concerning these Defendants' viewpoint-based censorship on the City Council Facebook page as unconstitutional;

2. Provide declaratory relief pursuant 28 U.S. Code § 2201 concerning these Defendants' viewpoint-based censorship of the Plaintiffs on individual city councilor's Facebook page(s) as unconstitutional;

3. Enter a permanent injunction requiring Defendants to unblock the Plaintiff from all city elected officials and city Facebook all sites where he is currently blocked, and prohibiting Defendants from blocking the Individual Plaintiffs, or others, from these Facebook sites on the basis of viewpoint censorship;

4. Award Plaintiff his costs, including reasonable attorneys' fees, pursuant to 28

5. U.S.C. § 2412;

6. Grant further additional relief as may be just and proper pursuant 28 U.S. Code § 2202;

7. Grant compensatory damages pursuant 42 U.S. Code § 1983;

8. A grant of any other relief deemed necessary or proper;

Respectfully submitted,

Friday, June 8, 2018

Aaron Johnson,

Plaintiff, Pro Se